**GODES & PREIS, LLP**
James N. Godes (State Bar No. 132183)
  *jgodes@gaplegal.com*
Michael L. Kibbe (State Bar No. 302137)
  *mkibbe@gaplegal.com*
300 Spectrum Center Drive, Suite 1420
Irvine, CA 92618
Telephone: (949) 468-0051
Facsimile: (949) 872-2281

Attorneys for Plaintiffs
WELK RESORT GROUP, INC. and WELK RESORTS PLATINUM OWNERS
ASSOCIATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WELK RESORT GROUP, INC., a California corporation; and WELK RESORTS PLATINUM OWNERS ASSOCIATION, a California non-profit corporation,<br><br>                              Plaintiffs,<br><br>v.<br><br>REED HEIN & ASSOCIATES, LLC, dba TIMESHARE EXIT TEAM, a Washington limited liability company; SCHROETER GOLDMARK & BENDER, P.S., a Washington professional corporation; and KEN B. PRIVETT, PLC, an Oklahoma limited liability company,<br><br>                              Defendants. | Case No.:  3:17-cv-01499-L-AGS<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>**1.  Intentional Interference with Contractual Relations**<br>**2.  Violation of 18 U.S.C. 1961,** *et seq.*<br>**3.  Civil Conspiracy**<br>**4.  Violation of the California Unfair Competition Law, Business & Professions Code Sections 17200,** *et seq.*<br>**5.  Violation of the California Vacation Ownership and Time-Share Act, Business & Professions Code Sections 11245,** *et seq.*<br>**6.  Violation of the California False Advertising Law, Business & Professions Code Sections 17500,** *et seq.*<br>**7.  False Advertising in Violation of the Lanham Act, 15 U.S.C. 1125**<br><br>**DEMAND FOR JURY TRIAL (to all claims where available)** |

By way of this Complaint, Plaintiffs Welk Resort Group, Inc., and the Welk Resorts Platinum Owners Association (collectively, "Welk"), aver against Defendants Reed Hein & Associates, LLC (doing business as Timeshare Exit Team), Schroeter Goldmark & Bender, P.S., and Ken B. Privett, PLC, (collectively, "Defendants"), as follows:

## **INTRODUCTION**

1. The Vacation ownership industry (commonly known as "timeshare") has grown into a nearly $60 billion dollar a year industry. In the last decade, a cottage industry has sprung up where unscrupulous organizations called "timeshare exit companies" target and victimize legitimate vacation ownership companies, like Welk, and their owners. Timeshare exit companies utilize false and misleading advertising and promises, to entice timeshare owners into paying large sums of money, up front, to the exit company. The exit company instructs the timeshare owners to stop making the required payments under their contracts to the vacation ownership companies and the vacation owners associations. These exit companies then utilize a portion of their ill-gotten gains to pay attorneys to step in between the vacation ownership companies and the timeshare owners and stop the flow of communication between them. Vacation ownership companies are then forced to pursue their legal remedies, such as recovering the timeshare ownership through foreclosure. At the same time, the exit company takes credit for getting the timeshare owner out of their timeshare contract without consequence, when, in fact, they simply used a fraudulent scheme to shield the timeshare owner from discovering that, among other harm, their credit has been damaged for defaulting on their contractual financial obligations.

2. Even more disturbing is the use of attorneys to perpetuate this fraudulent scheme, which has caused tens of millions of dollars in damages to vacation ownership companies and vacation owners associations. In exchange for large amounts of money from the exit companies, the attorneys violate their ethical and legal duties to further victimize timeshare owners. To be sure, the exit companies pay the attorneys directly and

instruct the attorneys not to communicate with the timeshare owners. The attorneys then follow the exit company's instructions to write form letters to the vacation ownership company, sometimes falsely alleging the company committed some wrongdoing, and stating that they now "represent" the timeshare owner. The law firms then demand that all further communications to the timeshare owner by the vacation ownership company must stop and instead be made only to the attorney. Many times, the timeshare owner is not even aware that they are represented by an attorney; the attorney has not spoken to the timeshare owner and the attorney conducts no investigation into the facts before sending letters. By stopping the flow of information to the timeshare owner (among other things), in exchange for a share of the ill-gotten gains, the attorneys perpetuate the fraudulent scheme and make it possible for the exit companies to interfere with vacation ownership companies' contracts at the expense of timeshare owners. The victimization of the vacation ownership companies and the timeshare owners by the exit companies and the attorneys must stop, and as stated in more detail below, Welk is petitioning this court for help.

<u>Background to the Vacation Ownership Industry</u>

3. Vacation ownership provides owners with a shared right to use designated resorts or properties and has been a key component of the vacation industry since the 1970s. Each year in the U.S., the vacation ownership industry contributes billions of dollars towards the hospitality and leisure economy and enables millions of families to enjoy vacation accommodations without the burdens associated with buying a second home or vacation property. Last year alone, this industry generated more than $10.6 billion in annual sales of new units, with over 180,000 vacation owner units in operation across the country, collectively producing jobs, supporting local economies, and contributing to tax revenues. Per the American Resort Development Association ("ARDA"), the industry's trade association, 9.2 million households in the U.S. were vacation owners in 2016.

**SECOND AMENDED COMPLAINT**

4. The economic impact of this industry spans across the globe. In 2015, the industry produced over $57 billion in direct economic output, nearly $17 billion in taxes, and supported 1.3 million jobs. As an expansive, global industry with properties in over 120 countries, vacation ownerships provide a truly diverse experience.

5. Vacation ownership also impacts the California economy. Eight percent of all U.S. vacation ownership units are located in California, along with a growing base of new and expanding resorts. In 2015, the industry provided more than 24,000 jobs and $1.3 billion in salaries and wages, and an estimated $3.6 billion in consumer and business spending to local economies, including $267 million in local and state tax revenues for California. In all, California's tourism industry saw $10.3 billion in tax revenue in 2016, proving that "California is a very popular destination, both nationally and internationally.[1]"

Welk Resorts

6. Welk was founded in 1964 by famed band leader and entertainer, Lawrence Welk, in Northern San Diego County, and grew from a hotel, golf course, and restaurant on a few hundred acres into one of the leaders in the vacation ownership industry. Headquartered in the San Diego, California area, Welk is unique from many of its Florida-based competitors.

7. Welk now develops and operates multiple resorts in the U.S. and Mexico. Most of Welk's resorts are in California, located in the San Diego, Palm Springs, and Lake Tahoe areas. Welk also has resorts in the Branson, Missouri, and Cabo San Lucas, Mexico areas. Welk's resorts have earned top marks and awards in the industry and are consistently recognized for their high quality. Welk is a family and employee-owned company, and has won numerous industry awards, including Employer of the Year, Project of the Year, and Most Innovative Company.

8. Welk employs approximately 1,400 people in California. It paid over $71

---

[1] http://www.latimes.com/business/la-fi-ca-economic-impact-20170504-story.html

**SECOND AMENDED COMPLAINT**

million in salaries and wages to California residents in 2016 and provides an estimated economic impact of over $114 million to the state. Welk has over 56,000 owners in its vacation ownership program and sees tens of thousands of guests and families visit its resorts each year. In 2016, Welk saw approximately 65,000 guests check in for their vacations at its California resorts.

Timeshare Exit Team

9. Over the past several years, a cottage industry has sprung up to target vacation ownership companies like Welk and disrupt the valid legal contracts between resorts and their owners. Known as "timeshare exit companies," these schemes falsely promise and advertise that they have the ability get vacation owners released from their existing financial obligations to their resorts without consequences. Although they call themselves "consumer protection firms," they are nothing of the sort. Their strategy involves telling owners not to pay their bills so that their ownership is lost to foreclosure. Because these companies demand that the vacation ownership company send all correspondence to them, or the attorneys with whom they divide the spoils, the owners are typically unaware of what happened until they discover their credit is significantly hurt. Timeshare exit companies charge consumers thousands of dollars in upfront fees for this alleged "service."

10. Reed Hein & Associates, LLC (operating as "Timeshare Exit Team" or "TET") and its co-conspirators have utilized illegal and unethical business practices to defraud thousands of vacation owners. Defendants' scheme to disrupt Welk's contractual relationships with its vacation owners involves using fraudulent advertising, and making false statements and unrealistic promises to unsuspecting owners, in order to extract exorbitant, unwarranted fees. Defendants' fraudulent scheme interferes with Welk's business by impeding Welk's ability to communicate with its owners, and by misleading Welk's owners into defaulting on their financial obligations to _both_ the resort developer, Welk Resort Group, Inc., _and_ the vacation owners association, Welk Resorts Platinum Owners Association (the "Association"), by falsely guaranteeing that there will be no

**SECOND AMENDED COMPLAINT**

consequences to the vacation owner's credit scores if they default. Their illegal scheme has caused severe consequences for unsuspecting Welk vacation owners and for the Welk business. Their schemes have caused financial and reputational damage to Welk, which has enjoyed more than 50 years of providing high-quality vacation ownership opportunities and resort stays to millions of people.

11. Reed Hein & Associates, LLC, in concert with its co-conspirators and as part of a wide-ranging scheme, has intentionally interfered in Welk contracts by leading Welk's owners to believe that TET has a relationship with Welk and works with Welk to "dissolve" owners' contracts and repair negative credit reporting information. In reality, Reed Hein & Associates, LLC (which is not a law firm) is systematically and intentionally soliciting Welk vacation owners under the trade name "Timeshare Exit Team," in a fraudulent scheme designed to induce Welk owners to breach their contracts with and payment obligations to Welk—all while steering them to instead pay $5,000, or more, to TET, which TET then illegally splits with its lawyer co-defendants. As a result of this wide-ranging, fraudulent racketeering scheme, Welk Resort Group and Welk Resorts Platinum Owners Association have no other option but to seek justice for themselves and injunctive relief to prevent the Defendants from further damaging their vacation owners, vacation owners for other companies in the industry, and other vacation ownership companies and associations who could become the next victims of this unscrupulous web of bad actors.

## NATURE OF ACTION

12. This lawsuit seeks to hold Defendants accountable for interfering with Welk's contracts with its owners and violating various state and federal laws.

13. When customers agree to purchase Welk's vacation ownership program, they enter into valid, enforceable contracts with *both* Welk Resort Group, Inc., the company that develops and manages Welk's resorts, *and* Welk Resorts Platinum Owners Association, the primary association that governs the interests of Welk's program and its members. All Welk owners automatically become a member of the Association. The

**SECOND AMENDED COMPLAINT**

financial responsibilities of an Association member are similar to those faced by members in a homeowners' association for a condominium or home – non-payment of fees by one member becomes the shared responsibility of the other members.

14.     One of the contracts between new owners and Welk is the Purchase and Sales Agreement. Following this agreement, buyers who have requested financing from Welk execute a separate Promissory Note. Both of these contracts obligate the owner to make payments to Welk for: (1) the purchase of a Welk ownership, which provides the owner a right to reserve and stay at Welk's various resorts using a means of exchange called Points; and (2) recurring fee obligations to the Association. The fees paid to the Association benefit all owners because they are used to maintain and upgrade the resort properties, and cover joint costs that help preserve and improve the quality and character of the resorts, such as furnishings, landscaping, utility payments, and housekeeping services.

15.     Despite being well-aware of the contractual relationships between Welk Resort Group, the Association, and their vacation owners, TET markets itself to Welk owners through radio and internet advertisements—and in person at events such as the San Diego County Fair—claiming to be a "Consumer Protection Firm" offering a "100% guarantee" that Timeshare Exit Team will "dissolve [their] timeshare contract … Safely. Legally. Forever." *See* **Exhibit A.**  TET's misleading marketing efforts are designed to induce Welk owners and Association members to breach their contracts and obligations with Welk, and instead to enter into a contract with TET.

16.     After Welk owners are lured into retaining TET, TET representatives instruct Welk owners to stop making their required payments to both Welk Resort Group and the Association, and specifically advise that there will be no consequence to the owners for failing to meet their contractual payment obligations. TET's representatives know that by giving owners this advice, owners will breach their valid and enforceable agreements with Welk. Identifiable owners of Welk vacation ownership interests have followed this advice from TET's representatives and Welk has been damaged as a result.

17. The instructions from TET's representatives are then furthered by the attorneys that TET retains. These law firms, including Ken B. Privett, PLC ("Privett") and Schroeter Goldmark & Bender, P.S. ("SGB"), **do not represent the Welk owners who paid TET.** On information and belief, these firms do not meet with or speak to the Welk owners. Their agreement with TET prohibits them from representing Welk owners and in fact explicitly states that these law firms "represents [TET] only and not its customers [*i.e.* Welk owners who have retained TET]." *See* **Exhibit C.**

18. TET and their cadre of attorneys then conspire to send generic, one-page form letters to Welk. In these letters, the attorneys falsely claim to represent the owners. *See* **Exhibit B.** The letters simply request that Welk release the owner from his or her contractual obligations; they do not identify any disputes or any legal basis for voiding the owners' contracts. *Id.* These attorneys fail to provide specific information about the nature of the owners' purported (and in many cases, non-existing) disputes—despite multiple requests by Welk for any details whatsoever. Welk is informed and believes that the owners are often not even aware that they are "represented" by these law firms, and that they are not even aware of, much less consent to, the trivial, one-size-fits-all letters being sent.

19. The attorneys' letters also instruct Welk not to communicate with the owners, and to communicate only with the attorneys purportedly representing the owners. This prevents Welk from communicating with the owner to help resolve his or her concerns, and also prevents the owner from receiving collection notices and correspondence from Welk about the delinquency and foreclosure of the vacation ownership. As a result, owners "represented" by TET are under the false impression that they have been "released" from their contractual obligations to Welk, when in fact what really happened was that they fell delinquent and were foreclosed upon. This, of course, subjects Welk owners to potential legal action to collect their outstanding debts, and negatively impacts their credit, contrary to Defendants' patent misrepresentations that the owners will suffer no consequence from not paying Welk.

**SECOND AMENDED COMPLAINT**

20. On information and belief, TET uses its fraudulent marketing scheme to develop leads that it then sells to attorneys and law firms such as Privett and SGB, in violation of California laws prohibiting non-attorneys from obtaining business for law firms in exchange for compensation, and without registering as a Lawyer Referral Service with the California Bar (which is required by Business & Professions Code § 6155 and California Rules of Professional Conduct, Rule 1-320 (Financial Arrangements with Non-Lawyers)).

21. These law firms, including Privett and SGB, conduct little to no investigation of any Welk owner's purported dispute; they have little to no direct contact with most of the Welk owners that they purport to represent; and instead they are simply acting at TET's direction in return for a slice of the fee that TET has wrongfully and illegally diverted to themselves.

22. TET and its co-conspirators have developed and executed this illegal fee-splitting scheme in order to collect and profit from fees that they obtain from Welk's owners—fees that otherwise would have been used to pay Welk for amounts properly owed to Welk Resort Group and the Association.

23. Defendants' fraudulent scheme has caused Welk owners to breach their vacation purchase contracts and become delinquent in their payment obligations to Welk, and has wrongfully routed hundreds of thousands of dollars into Defendants' coffers that would otherwise have been used to pay down financing debts and association fees rightfully owed to Welk and the Association. For example, on January 20, 2016, two Welk owners contacted Welk via letter, stating that they had "spoken to … Timeshare Exit Team (855) 577-0626 … [who] assured me that the case … justifies the cancellation of our timeshare with your resort." On April 16, 2016, a Welk owner contacted a Welk employee via email, and stated, "We have contacted Timeshare Exit Team and they have assigned [a law firm] to file civil suit. They have advised the process will take 6-8 months to obtain the Mutual Release." Welk never received a lawsuit filed on behalf of the owner.

**SECOND AMENDED COMPLAINT**

24.     On April 27, 2016, two Welk owners duped by TET into believing that TET has some type of direct business relationship with Welk filed a civil lawsuit in the Superior Court of California, County of San Diego, naming Welk and TET as co-defendants. The owners complained that "… Defendant [TET], has a particularly cozy (yet purportedly arms-length) relationship with the other defendants in that an exit agreement between [TET] and [the owners] is built into the timeshare purchase transaction whereby [the owners] purportedly agree to sell their timeshare interest to [TET] (instead of back to the [Welk] directly) for a set price). However, this set price ($5795 for [the owners]) is unconscionably high … the relationship between [TET] and [Welk] is not an arms-length relationship, that [TET] is not a third party with respect to [Welk] and that [Welk has] a material interest in either this purported exit agreement or in the purported exit fee associated with invoking the exit agreement." These allegations were false. Welk was damaged by this insofar as it had to settle the owners' lawsuit under confidential terms and expended legal fees defending the case, and suffered harm to its reputation from being associated with Defendants' illegal scheme.

25.     As a further illustration of how Defendants' illegal scheme works, on or about July 3, 2017, a Welk employee attended the San Diego County Fair at the Del Mar Fairgrounds. The employee stopped at a TET booth present at the fairgrounds' exhibitor area. *See* **Exhibit D.** Defendants' representative (Angie Poole) made numerous false promises to the individual in order to secure business in an attempt to interfere with Welk's operations. Specifically, Defendants represented:

a.  That the individual could "stop paying on the timeshare" in order to afford TET's services;

b.  That TET works with experienced attorneys who "guarantee" they will get people out of their contracts;

c.  That TET "does business with Welk";

d.  That TET instructs owners to "stop paying" on their ownerships and that this activity "won't negatively affect" their credit; and

e. That exit from an ownership is "guaranteed" and all credit repair is also "guaranteed" if credit has been negatively affected.

26.     Ms. Poole also stated that the cost of service from TET would be approximately "$2,000 to 5,000" up front.

27.     As a result of Defendants' wrongful conduct, Welk has suffered monetary and non-monetary damages, and seek redress for Defendants' illegal acts, as well as declaratory and injunctive relief to end Defendants' illegal practices and prevent further losses to Welk Resort Group and the Association.

## PARTIES

28.     Welk Resort Group is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Marcos, California. It develops and manages high-quality resort properties in California, Missouri, and Mexico. As part of its operations, Welk, through an affiliate, offers vacation ownerships for sale at its resort locations.

29.     The Association is a non-profit corporation organized and existing under the laws of the State of California, with its principal place of business in San Marcos, California. Customers who make vacation ownership purchases with Welk become members of the Association.

30.     Plaintiffs are informed and believe, and on that basis aver, that Defendant Reed Hein & Associates, LLC (also known as "ReedHein & Associates," or "ReedHein") is a limited liability company, organized and existing under the laws of the State of Washington, with a corporate office in Lynnwood, Washington, of which Brandon Reed ("Reed") and Trevor Hein ("Hein") are the sole members.  Reed is an individual domiciled in King County, Washington, and is a citizen of the State of Washington. Hein is an individual domiciled in Surrey, British Columbia, Canada, and is a citizen of the country of Canada.

31.     Plaintiffs are informed and believe that Defendant Timeshare Exit Team ("TET"), is an alter-ego dba of ReedHein, operating out of ReedHein's corporate office

located in Lynnwood, Washington, and having the same principal place of business as ReedHein.

32.     Plaintiffs are informed and believe that at all times herein mentioned, Defendants ReedHein and TET were the alter egos, agents, servants, accomplices, and/or employees of each other, acting within the course and scope of said relationships, and whose acts or omissions averred herein were authorized, adopted, approved or ratified by each other.

33.     Plaintiffs are informed and believe that Defendant SGB is a professional corporation, organized and existing under the laws of the State of Washington, with its principal place of business in Seattle, Washington.

34.     Plaintiffs are informed and believe that Defendant Privett is a limited liability company, organized and existing under the laws of the State of Oklahoma, with its principal place of business and corporate office in Pawnee, Oklahoma, of which Ken B. Privett is the sole member.  Ken B. Privett is an individual domiciled in Pawnee County, Oklahoma, and is a citizen of the State of Oklahoma.

## JURISDICTION

35.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because a federal question is presented under both the Civil RICO Act, 18 U.S.C. § 1961, and the Lanham Act, 15 U.S.C. § 1125(a).  Finally, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other state law claims that are so related that they form a part of the same case or controversy.

36.     This Court may exercise personal jurisdiction over all Defendants because this action arises out of and is related to Defendants' purposeful contacts with the State of California.

## TET

37.     TET (i) solicits owners of vacation ownership interests, many of whom reside in California and/or whose vacation ownership interests are located in California, through the use of false, misleading and deceptive advertising, and (ii) intentionally

**SECOND AMENDED COMPLAINT**

interferes with the contracts between Welk, a California corporation, and owners of Welk vacation ownership interests, as well as the Association and its members

38.    TET's internet-based operations subject them to personal jurisdiction in the state of California.    TET solicits owners of California vacation ownership interests through the use of false, misleading, and deceptive advertising it contains on its website, http://www.timeshareexitteam.com.    This website is not a passive advertising website. TET solicits and receives the contact information of owners of California vacation ownership interests through the website, which involves the repeated transmission of computer files over the internet and allows owners of California vacation ownership interests to exchange their contact information with a host computer.  *See e.g.* **Exhibit G**.

39.    TET commits tortious acts in the state of California, specifically, tortious interference with contractual relationships between Welk Resort Group, the Association, and owners of Welk vacation ownership interests, as well as the Association and its members.  TET instructs owners of Welk vacation ownership interests to cease making valid payments of maintenance fees, promissory notes and loan payments to Welk, which damages Welk.

40.    TET also executes agreements with owners of Welk vacation ownership interests, some of whom own vacation ownership interests in California.    TET is to perform these agreements, in whole or in part, in California, in that TET is to negotiate with Welk to secure the release of any future obligations the owners of Welk vacation ownership interests owe to Welk, together with the cancellation of the owners' contracts with Welk.    To effect the cancellation, TET instructs its retained attorneys, SGB and Privett, to mail letters addressed to Welk in California.

Privett

41.    Privett commits tortious acts in furtherance of the scheme in the state of California, specifically, tortious interference with contractual relationships between Welk and owners of Welk vacation ownership interests.

42.    Many of the owners of Welk vacation ownership interests, who are

**SECOND AMENDED COMPLAINT**

purportedly represented by Privett, reside in California and/or own a vacation ownership interest located in California.

43.     TET retains Privett on behalf of TET's clients in order to effectuate the promised "exit."  After TET representatives instruct owners of Welk vacation ownership interests to stop making any payments to Welk and the Association, TET instructs Privett to contact Welk in California in writing, by phone, and by e-mail on behalf of TET in the name of the owners of Welk vacation ownership interests in order to negotiate settlement and cancellation of the Welk vacation ownership agreements.

44.     These communications are directed to Welk in California and serve further the interference between the contractual relationships between Welk and owners of Welk vacation ownership interests.

<u>SGB</u>

45.     SGB commits tortious acts in furtherance of the scheme in the state of California, specifically, tortious interference with contractual relationships between Welk and owners of Welk vacation ownership interests.

46.     Many of the owners of Welk vacation ownership interests, who are purportedly represented by SGB, reside in California and or own a vacation ownership interest located in California.

47.     TET retains SGB on behalf of TET's clients in order to effectuate the promised "exit."  After TET representatives instruct owners of Welk vacation ownership interests to stop making any payments to Welk and the Association, TET instructs SGB to contact Welk in California in writing, by phone, and by e-mail on behalf of TET in the name of the owners of Welk vacation ownership interests in order to negotiate settlement and cancellation of the Welk vacation ownership agreements.

48.     These communications are directed to Welk in California and serve further the interference between the contractual relationships between Welk and owners of Welk vacation ownership interests.

49.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1332

**SECOND AMENDED COMPLAINT**

(diversity jurisdiction). This Court has diversity jurisdiction over the subject matter of this action because the amount in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

50. Together, Welk's monetary damages and the injunctive relief sought, which would preserve the value of Welk's contracts with current owners and members and allow for cost savings obtained by the cessation of Defendants' tortious conduct, is valued at well over $75,000.

## VENUE AND FORUM

51. Venue and forum are proper in the Southern District of California, pursuant to Title 28, U.S.C. § 1391(b), because a substantial part of the events or omissions on which Plaintiffs' claims are based occurred in this District, including the wrongful actions of the Defendants.

## GENERAL AVERMENTS

52. At the time a purchaser buys a Welk vacation ownership, each customer executes a written purchase and sale agreement ("Purchase Agreement"). In addition, and pursuant to the Purchase Agreement, Welk vacation ownership owners also become members of the Association, and agree to pay maintenance fees, also known as Vacation Owner Association Dues ("VOA Dues"), to the Association, which enables the Association and Welk to maintain their high service standards and resort quality.

53. If a purchaser requests financing, he or she may execute and deliver a promissory note ("Promissory Note") in connection with the vacation ownership purchase.

54. Welk uses the revenue from the purchase of vacation ownership interests and VOA Dues to invest in the development and perpetual improvement of its resorts and services for the benefit of all owners and guests. They continually add new and improved services for their members and constantly otherwise improve their member experience.

55. Welk also actively and aggressively protects its proprietary business practices and processes and its brand. Welk has devoted substantial resources to

advertising and other marketing promotions to increase the visibility and recognition of its products and to maintain and enhance the value of its brand. Welk competes directly with other developers and marketers of vacation services who target similar customers. The goodwill associated with Welk's brand and its products is essential to Welk's ability to effectively compete in a highly competitive marketplace.

56. On information and belief, Defendants are co-conspirators, acting in concert, and have been engaging in a scheme designed to disrupt Welk's contractual relationships with its vacation owners and association members.

57. In order to lure vacation owners to hire TET, TET makes false and misleading statements, including guarantees on its websites and procures celebrity endorsements to sell its services to vacation owners, including Welk owners. TET's scheme consists of obtaining vacation ownership clients via digital marketing, radio advertisements, in-person solicitation, and, on information and belief, direct mail advertisements, within and outside of the State of California.

58. On its website, TET advertises it will utilize its "process" to "get rid of" owners' vacation ownership contracts "Safely. Legitimately. Forever."

59. TET misrepresents to owners that any of its advertised reasons are legally sufficient reasons to terminate a vacation ownership contract when, in fact, none of these are legal bases for a vacation owner to cease making his or her payments under their legally-binding contracts with a vacation ownership company, and to cease making his or her payments to their Association.

60. TET also assigns leads to TET representatives who use these same false and misleading claims to lure owners, including Welk owners to breach their contractual obligations. For example, on May 27, 2016, two former TET employees filed suit against TET, alleging in their complaint that the company "assists timeshare owners in dissolving their timeshare contracts" and would assign them "leads" and provide them "scripts" to use with timeshare owners. ***See Anderson et al v. Reed Hein & Associates LLC*. Docket 2:16-cv-00785-RSL W.D.Wash. (May 27, 2016**).

61.     It is at this point in TET's advertised "unique strategy" that TET instructs vacation owners who have signed up with them and paid them thousands of dollars in an upfront sign-up fee –sometimes upwards of $5,000 – to cease paying any money to Welk or the Association on their vacation ownership obligations, such as owners' Promissory Notes as well as the maintenance fees due pursuant to the Purchase Agreement.

62.     By doing so, TET misrepresents to the owners, including Welk owners, that vacation ownership companies will be more willing to allow the owners to "exit" their vacation ownership.  TET further:

    a.  Misrepresents to Welk owners that TET has a preexisting agreement with Welk or otherwise does business with Welk to guarantee termination of any purchase contracts;

    b.  Misrepresents to Welk owners that TET can guarantee that there will not be any negative credit reporting by Welk or that any prior negative credit reporting by Welk can be eliminated;

    c.  Misrepresents to Welk owners that stopping payment on a Welk contract or on Association dues will not affect their credit or constitute a breach of their contracts with Welk;

    d.  Sends unsolicited and/or knowingly fraudulent and misleading correspondence to Welk owners regarding their contractual obligations;

    e.  Deceptively represents to Welk owners, among other things, that TET "guarantees" to permanently eliminate their contractual obligations; and

    f.  Solicits Welk owners to pay TET in lieu of paying on their contractual obligations to Welk and the Association.

63.     TET's actions are unlawful, as they impermissibly interfere with the contractual relationship between Welk and Welk owners and members through false and deceptive means.

64.     On information and belief, after obtaining a lead through this marketing scheme, TET passes the lead to a rotating band of attorneys and/or law firms such as

**SECOND AMENDED COMPLAINT**

SGB and Privett, while sharing a flat fee in exchange for the referral. (For example, on July 6, 2016, TET's CEO Brandon Reed told USAToday.com that "his company uses lawyers 'to get the resort to take the timeshare back.'" *See* **Exhibit E.**) TET collects a flat fee from owners, including Welk owners, totaling $5,000 or more, depending on the amount of their outstanding vacation ownership debt to Welk, which they split among and between TET and the law firms it retains, including SGB and Privett.

65. Pursuant to master fee agreements between TET and these law firms, including Privett and SGB, TET is prohibited from representing to TET customers that the attorneys hired by TET are the TET customer's attorney. *See* **Exhibit C.** Nonetheless, TET representatives have stated to identifiable Welk owners that the attorneys working on the Welk owners' alleged negotiations were "their" attorneys – a completely misleading and false statement.

66. As one of the final steps to convince owners to retain them, TET provides a chart outline the cost of paying the owner's vacation ownership company as compared to paying TET for its services. On information and belief, TET provided an identifiable Welk owner a chart similar to the one contained within **Exhibit F**, which calculated the cost of paying annual maintenance fees plus special assessments in the amount of $20,122.00 for the next 15 years, together with total future loan payments in the amount of $24,086.00, for a total of $44,208.00 versus paying $6,995.00. Printed over the final comparison figures, TET asks a simple question: *"Which of these would you rather pay?"* Of course, the chart leaves out the fact that paying Welk gets the owner high-quality resort vacations, while paying TET leaves the owner with a foreclosure and destroyed credit.

67. TET seeks out vacation owners, including Welk owners, to pay money to them instead of to the owners' vacation ownership companies. Specifically, TET seeks to divert money that Welk owners owe to Welk, from Welk to TET instead.

68. According to TET's website, after signing TET's retainer documents, owners are then assigned an "Account Coordinator who [becomes their] main point of

**SECOND AMENDED COMPLAINT**

contact during [the owner's] entire process. No general 800 phone numbers or endless automated phone systems while trying to reach Customer Service. [The] Account Coordinator will explain how the process works and will provide [the owner] with status updates throughout the exit process." In fact, however, the e-mail updates that Welk owners have received are scant, non-specific, and designed to string along Welk owners into believing that actual work is being done on their behalf.

69. Thereafter, TET begins what it misleadingly refers to as its "negotiation process" with the owners' vacation ownership companies, including Welk. On its website, TET states that the "specifics of the process will depend on your ownership situation and how the resort responds to our requests," but, notwithstanding the fact that TET has "a skilled in-house team," TET "will retain an attorney on your behalf if needed." TET promises "exit" or it will refund the entirety of the fee to the owners.

70. TET's representation that it negotiates on behalf of owners is false. In fact, TET's "skilled in-house team" is not doing any work to negotiate anything at all. Instead, TET "retains" its co-conspirator law firms and attorneys, including Privett and SGB, to communicate with the vacation ownership companies. TET's relationship with its attorneys is pursuant to master fee agreements by which TET agrees to pay these law firms a cut of the fee TET obtains at sign-up—$1,200.00 per owner. TET also promises to send law firms at least 800 files a month, meaning that firms such as Privett and SGB make at least $960,000.00 per month on this scheme. *See* **Exhibit C**. Of course, since the firms receive only a flat fee of $1,200.00 per file and their client is TET, not the owners, they have no incentive to spend time investigating any particular owner's issues, no incentive to assist owners with real disputes, and no incentive to engage in owner-specific negotiations.

71. Once a "file" is referred to TET's co-conspirator law firms and attorneys, including Privett and SGB, these law firms then contact Welk in order to "negotiate" an exit of the vacation ownership contract.

72. Indeed, Privett in Oklahoma sends boilerplate representation letters to Welk

**SECOND AMENDED COMPLAINT**

simply stating that "we want to terminate the above referenced owners' obligations with your timeshare company." However, no factual information is provided to Welk about the purported dispute, other than the fact that the vacation owners are interested in exiting their ownership. For example, the attorneys make no specific claims on their "clients'" behalves, and instead demand that Welk no longer contact the vacation owners directly, as they are represented by counsel in this unidentified dispute. On information and belief, many owners are never contacted by their "attorney" or law firm after they are solicited by TET to breach their Welk contracts; they are not aware what outside attorney is acting and communicating on their behalf; and they have no direct relationship or contact with "their attorney." These letters, together with any subsequent correspondence, telephone calls, and e-mails, which also instruct Welk not to contact the Welk owner Privett purportedly "represents," serve to further TET's interference with the contractual relationships between Welk and the Welk owners.

73. SGB in Washington is also retained by TET and sends letters to Welk on an entirely non-legal basis of "on behalf" of Welk owners who have also never met any of the lawyers at SGB. SGB's letters to Welk simply state that their purported clients "are interested in terminating their time share memberships. With the lone exception of forwarding routine billings to the client via mail, you are hereby notified not to contact our clients in any format." The letters are "one size fits all" correspondence whose purpose is merely to forbid Welk from communicating with Welk owners. These letters, together with any subsequent correspondence, telephone calls, and e-mails, serve to further TET's interference with the contractual relationship between Welk and Welk owners.

74. Because the vacation owners are purportedly represented by counsel, vacation ownership companies, including Welk, are forbidden from communicating with the owners. Accordingly, these owners are completely unaware – until they learn that their default has been reported on the owner's credit report – that TET, Privett, and SGB are accomplishing absolutely nothing for them except for interference with the contracts

they hold with Welk.

75.     Meanwhile, as Welk waits for TET's co-conspirators to provide factual support for any kind of valid dispute as to the ownership (which almost never arrives), it receives no payments on the affected owners' Purchase Agreements per the advice given to the owners by Defendants, and the Association receives no payment for outstanding dues. These breaches inevitably result in negative reporting to credit agencies against the owners, contrary to TET's advertising and express representations to the owners. In addition, the lack of Association payments encumber other owners with increasing fees in order to maintain improvements and quality of the resorts.

76.     On information and belief, TET pays fees to Privett and SGB for their services in furtherance of TET's scheme pursuant to master fee agreements by which Privett and SGB are paid a portion of the TET upfront fee and promised a volume of hundreds of files every month.  *See* **Exhibit C.**

77.     To date, TET's false, deceptive, and misleading advertising has caused identifiable Welk owners to retain TET and, at TET's instructions, (1) to stop making payments on their Promissory Notes they signed when they purchased their vacation ownership interest, and (2) to stop paying maintenance and other fees to the Association they contractually committed to pay.  Privett and SGB further TET's scheme to damage Welk by sending representation letters rife with false or non-existent legal grounds for termination (and in some case no reasons at all) and by forbidding Welk to communicate with Welk owners.  These Defendants engaged in this arrangement together for their collective pecuniary benefit.

78.     Altogether, Defendants intentionally and unjustifiably interfered with Welk's contractual business relationships with Welk owners by luring them with false, deceptive, and misleading advertising, and through direct promises, and advising them to breach their contractual relationships without any valid grounds, in exchange for a fee and the false assurance that there will be no harm to their credit scores and that they will be "exited" from their ownership "Safely.  Legally.  Forever."

**SECOND AMENDED COMPLAINT**

79.     As a direct and proximate result of Defendants' intentional and unjustified interference with Welk's contractual relationships with Welk owners – and in furtherance of their fraudulent scheme – Welk has been damaged.  To be sure, Defendants' scheme has cost Welk approximately $5.68 million worth of loan balances that it would have otherwise received through Welk's contractual relationship with its owners.  Additionally, Defendants' scheme has caused in excess of $256,000.00 worth of yearly VOA Dues owed to the Association by Welk owners, pursuant to the Purchase Agreements, to go into default as of today.   The long-term damage caused by Defendants' intentional interference and fraudulent scheme, through the loss of contractually obligated VOA Dues, is approximately $9.8 million.

## **FIRST CLAIM FOR RELIEF**

### **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

### **Against All Defendants**

80.     Plaintiffs incorporate averments set forth in paragraphs 1-79 above, as if set forth in full herein.

81.     As averred herein, Plaintiffs have valid and enforceable contracts with Welk owners.

82.     Defendants had knowledge of the existence of those contracts between Plaintiffs and Welk owners.   The very fact that Welk owners have contracts with Plaintiffs is the basis under which Defendants sought to establish a relationship with Welk owners.

83.     Defendants sought to capitalize on Plaintiffs' contractual relationships with Welk owners by soliciting them through TET's false and misleading advertising and promises, fraudulently inducing them to pay large upfront fees to TET, and fraudulently inducing them to stop making payments to Plaintiffs notwithstanding Welk owners' legally enforceable contracts with Plaintiffs.  Indeed, TET's advertises on its website that it is dedicated to assisting owners to get out of their contracts, and states boldly that "our personal GUARANTEE to you is that our team of consumer advocates will get your out

-22-

of your timeshare, period." ***See* <u>Exhibit G.</u>** In some instances, TET describes itself as a "Consumer Protection Firm," while in others it states that it is not a law firm. TET has also advised vacation owners that they can easily terminate or void their contracts, such that the owners can walk away from any contractual obligation with no consequence whatsoever.

84.     TET intended to disrupt the contracts between Welk and Welk owners, as they sent targeted correspondence directly to Welk owners advising them that TET could assist them in canceling or avoiding their vacation ownership obligations. In those marketing materials, among other false promises, TET advised that their services are "GUARANTEED."

85.     TET's willful and fraudulent actions to induce parties with whom Plaintiffs have valid contractual agreements to breach their agreements constitute intentional interference with an existing contractual relationship.

86.     Furthermore, TET has intentionally, and without justification or privilege, interfered with Plaintiffs' existing contracts by inducing Welk owners to immediately stop making any further payments under their contracts without any legal basis.  Privett and SGB advance and contribute to TET's interference by sending representation letters to Plaintiffs, providing no basis for termination of Welk owners' contracts.  Nonetheless, TET conspires with SGB and Privett (among many other law firms) to send generic form letters to Welk, wherein a law firm claims to represent the owners that TET has induced to breach their contract. However, their attorneys never provide specific information about the nature of the owners' dispute—despite multiple requests by Welk for any details whatsoever.  Worse, Privett and SGB's "representation" letters are fraudulent because, despite their written representations to the contrary, neither Privett nor SGB actually represents any Welk owner.  To be sure, this is specifically prohibited by TET's master fee agreement it enters with Privett and SGB.  While this false claim of representation is unknown to Plaintiffs, in order to comply with the law and other ethical obligations, when Privett and SGB instruct Welk not to communicate with the owners

further, and to communicate only to the attorneys purportedly representing the owners, Welk complies – all to Plaintiffs' detriment.

87.  Defendants' intent is to harm Welk along with the owners, including disruption to and diminishment of Welk's business, contractual relationships, and reputation.  Collectively, Defendants' actions were not made in good faith, but rather were made with purely mercenary reasons so as to earn and retain the large pre-paid retainer fee without actually providing any meaningful services to Welk owners and were done with the knowledge and purpose of injuring Plaintiffs or with knowledge that disruption of performance by Welk owners was certain or substantially certain to occur.

88.  Defendants' conduct has disrupted Plaintiffs' contracts with Welk owners, threatens to continue to disrupt Plaintiffs' contracts with Welk owners, and has made the performance of Plaintiffs' contracts with Welk owners more expensive and/or difficult.

89.  As a direct and proximate result of Defendants' collective intentional misconduct, Welk owners have terminated, or have sought to terminate, their contractual relationship with Plaintiffs before the expiration of the terms of those contracts.

90.  Defendants did not have any justification or privilege in procuring the breach of such contracts.

91.  As a direct and proximate result of Defendants' intentional and unjustified interference with Welk's contractual relationships with Welk owners – and in furtherance of their fraudulent scheme – Plaintiffs have suffered damages.  To be sure, Defendants' scheme has cost Welk $5.68 million worth of loan balances that it would have otherwise received through Welk's contractual relationship with its owners.  Additionally, Defendants' scheme has caused $256,000.00 worth of yearly VOA Dues owed to the Association by Welk owners, pursuant to the Purchase Agreements, to go into default as of today.  The long-term damage caused by Defendants' intentional interference and fraudulent scheme, through the loss of contractually obligated VOA Dues, is approximately $9.8 million.

92.  Welk has also had to expend money, time, and energy in the form of hiring

**SECOND AMENDED COMPLAINT**

additional staff to manage the substantial volume of "exit" attorney letters coming from TET's co-conspirator law firms, including Privett and SGB. Welk has also had to expend money, time, and energy maintaining its established contractual relationships with Welk owners. Furthermore, Welk has suffered reputational damage as a result of Defendants' conduct.

93. Defendants' conduct was a substantial factor in causing Welk's harm. Because of Defendants' conduct, Welk is entitled to relief, including monetary damages and attorneys' fees and costs.

94. Further, Defendants' conduct was done maliciously, oppressively, and with the intent to interfere with Welk's existing contracts, all for Defendants' illicit benefit at Welk's expense. Accordingly, Welk is entitled to punitive and exemplary damages from Defendants, pursuant to California Civil Code section 3294 *et seq.*, in an amount sufficient to punish them for the tortious conduct averred herein and to dissuade them and others similarly situated from engaging in such conduct in the future.

## SECOND CLAIM FOR RELIEF

## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

### Against Defendant Reed Hein & Associates, LLC

95. Plaintiffs incorporate averments set forth in paragraphs 1-94 above, as if set forth in full herein.

96. This claim arises under 18 U.S.C. § 1962(c), which provides in part: "it shall be unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity."

97. TET, SGB and Privett are enterprises within the meaning of 18 U.S.C. 1961(4) that engaged in activities averred herein that affect or impact the state of California, to wit: TET, SGB and Privett conspired to unlawfully disrupt the contracts

between Welk and Welk owners, when TET targeted Welk owners who own vacation ownership interests in California; advised them that they could assist them in canceling or avoiding their vacation ownership obligations and contracts; and then sold those owners as leads to SGB and/or Privett (or engaged in a fee-splitting arrangement with them).

98.     Defendants acted in concert, and participated in the enterprise's affairs through a pattern of racketeering activity, consisting of numerous and repeated uses of mail and wire communications, in order to execute a scheme to defraud Welk, the Association, and Welk owners.

99.     On information and belief, TET sent or caused to be sent, materials by wire for the purpose of executing the scheme. These activities amount to a material scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and/or omissions. The materials include, but are not limited to, interstate website and digital advertisements, phone calls, emails, and interstate credit card transactions.

100.     On information and belief, TET sent or caused to be sent, materials via U.S. mail or commercial interstate carriers for the purpose of executing the scheme. These activities amount to a material scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and/or omissions. On information and belief, the materials include, but are not limited to direct mail pieces, contracts, and letters promoting the scheme.

101.     The predicate acts which constitute this pattern of racketeering activity include:

> a.     Beginning at least on or about July 1, 2017, and continuing today, TET caused the fraudulent use of interstate wires through TET's Internet website, which states that "our personal GUARANTEE to you is that our team of consumer advocates will get you out of your timeshare, period." This activity fraudulently induces Welk owners to breach their contract with Welk, in violation of 18 U.S.C. section 1343.  *See* **Exhibit G.** Despite TET's "guarantee," TET actually does nothing to accomplish an

exit for Welk owners and instead advises them to cease all contractually obligated payments owed to Plaintiffs, while advising them that their failure to comply with their contractual obligations will have no impact on them legally or otherwise.

b. Beginning at least on or about November 30, 2016, and continuing today, TET caused the fraudulent use of interstate mail to fraudulently induce Welk owners to breach their contracts by offering and mailing loan agreements to pay for any settlement with Welk, including credit card transaction information, in violation of 18 U.S.C. section 1341. *See* **Exhibit H.**

102. These acts of racketeering, occurring within five years of one another, constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

103. The enterprise was created and/or used as a tool to carry out the pattern of racketeering activity.

104. TET has committed directly, or aided and abetted the commission of the racketeering activities, and the acts pose a threat of continued racketeering activity, and therefore constitute pattern as such.

105. TET knowingly and intentionally made these misrepresentations, acts of concealment and failures to disclose. TET obtained money, and transferred money between it and TET's co-conspirators, as a result of these violations.

106. As set forth above, TET devised a scheme to defraud Welk owners in order to obtain money by means of false or fraudulent representations or promises by transmitting (through a pattern of racketeering activity – in interstate commerce) writings, pictures, and other electronic media for the purpose of executing the scheme.

107. As the matters alleged in the preceding paragraphs show, TET committed violations of 18 U.S.C. § 1962(c) by conducting the enterprise (in ways that affect interstate commerce) through a pattern of racketeering activity, *e.g.*, communicating its campaign of false or fraudulent representations or promises to obtain money by using the

mail and wires.

108.   A specific threat of repetition of the conduct exists since the conduct is TET's regular way of conducting business and it continues to presently employ this solicitation and communication scheme.

109.   As a direct and proximate result of TET's unlawful racketeering activity, Welk has been substantially harmed by Defendants' actions and has suffered damages in an amount to be proven at trial.  This includes, but is not limited to, a loss of $5.68 million worth of loan balances, a $256,000.00 loss of VOA Dues owed to the Association by Welk owners, pursuant to the Purchase Agreements, which have gone into default, and a $9.8 million loss of future VOA Dues – all money that Plaintiffs would have received through Welk's contractual relationship with its owners, but for TET's racketeering activity.

110.   Under the provisions of 18 U.S.C. §1964(c), TET is liable to Welk for three times the damages that Welk suffered, plus costs of brining the suit, and reasonable attorney's fees in connection herewith.

### THIRD CLAIM FOR RELIEF

### CIVIL CONSPIRACY

### Against All Defendants

111.   Plaintiffs incorporate averments set forth in paragraphs 1-110 above, as if set forth in full herein.

112.   Defendants are parties to a civil conspiracy.

113.   Defendants conspired to do an unlawful act.

114.   Defendants conspired to interfere with Welk's contractual relationships with Welk owners.

115.   Defendants each performed one or more overt actions in furtherance of their conspiracy, including without limitation:

> a.   TET uses misleading advertising and promises to lure Welk owners to obtain TET's services;

b. Once retained, TET encourages Welk owners to breach their contracts with Welk even though they have no legal basis to do so;

c. At TET's direction, Privett sends representation letters purporting to represent Welk owners which state false legal bases to Welk in furtherance of TET's interference between Welk and Welk owners, and TET pays a portion of vacation owners' fees to Privett for this; and

d. At TET's direction, SGB sends representation letters purporting to represent Welk owners, which state false legal bases to Welk in furtherance of TET's interference between Welk, and Welk owners, and TET pays a portion of vacation owners' fees to SGB for this.

116. Additionally, as set forth above, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

117. The predicate acts which constitute this pattern of racketeering activity include:

a. Beginning at least on or about July 1, 2017, and continuing today, TET caused the fraudulent use of interstate wires through TET's Internet website, which states that "our personal GUARANTEE to you is that our team of consumer advocates will get you out of your timeshare, period." This activity fraudulently induces Welk owners to breach their contract with Welk, in violation of 18 U.S.C. section 1343. ***See* __Exhibit G.__** Despite TET's "guarantee," TET actually does nothing to accomplish an exit for Welk owners and instead advises them to cease all contractually obligated payments owed to Plaintiffs, while advising them that their failure to comply with their contractual obligations will have no impact on them legally or otherwise.

b. Beginning at least on or about November 30, 2016, and continuing today, TET caused the fraudulent use of interstate mail to fraudulently induce Welk owners to breach their contracts by offering and mailing loan

agreements to pay for any settlement with Welk, including credit card transaction information, in violation of 18 U.S.C. section 1341. *See* **Exhibit H.**

118. Defendants Privett and SGB each performed one or more overt actions in furtherance of the conspiracy, including without limitation:

    a. Beginning at least on or about January 12, 2017, Defendant Privett conspired with other Defendants to cause the fraudulent use of interstate mail in furtherance of Defendants' scheme to fraudulently induce Welk's owners and members to breach their contracts with Welk, by sending a bare-bones, generic form letter to Welk, wherein the attorney claims to represent the owners that TET has induced to breach their contract, in violation of 18 U.S.C. section 1341. *See* **Exhibit B.** Welk is further informed and believes that the owners are often not even aware that they are "represented" by Defendant Privett, and that they are not even aware of, much less consent to, the trivial, one-size-fits-all letters being sent by Privett's firm. TET's lawyers instruct Welk not to communicate with the owners further, and to communicate only to the attorneys purportedly representing the owners. Accordingly, Welk can never inform those owners of the consequences of non-compliance with their obligations – all in furtherance of Defendants' fraudulent racketeering scheme.

    b. Beginning at least on or about March 1, 2017, Defendant SGB conspired with other Defendants to cause the fraudulent use of interstate mail in furtherance of Defendants' scheme to fraudulently induce Welk's owners and members to breach their contracts with Welk, by sending a bare-bones, generic, one-page form letter to Welk, wherein the attorney claims to represent the owners that TET has induced to breach their contract, in violation of 18 U.S.C. section 1341. *See* **Exhibit B.** Welk is further informed and believes that the owners are often not even aware that they

**SECOND AMENDED COMPLAINT**

are "represented" by Defendant SGB, and that they are not even aware of, much less consent to, the trivial, one-size-fits-all letters being sent by SGB's firm.  TET's lawyers instruct Welk not to communicate with the owners further, and to communicate only to the attorneys purportedly representing the owners.  Accordingly, Welk can never inform those owners of the consequences of non-compliance with their obligations – all in furtherance of Defendants' fraudulent racketeering scheme.

119.   Defendants intentionally conspired and agreed to directly and indirectly use income that was derived from a pattern of racketeering activity in their interstate enterprise, acquired or maintained interest in the enterprise through a pattern of racketeering activity, and conducted and participated in the conduct of the affairs of the enterprise through this pattern.

120.   Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described herein.  That conduct constitutes a conspiracy in violation of 18 U.S.C. § 1962.

121.   As a direct and proximate result of Defendants conspiracy, the overt acts taken in furtherance of that conspiracy, including the violation of 18 U.S.C. § 1962, Plaintiffs have been injured in their business and property in that Plaintiffs have lost $5.68 million worth of loan balances, $256,000.00 worth of VOA Dues owed to the Association by Welk owners, pursuant to the Purchase Agreements, which have gone into default, and $9.8 million of future VOA Dues – all money that Plaintiffs would have received through Welk's contractual relationship with its owners, but for Defendants' conspiracy.

122.   An injunction is also a viable form of relief for a cause of action for civil conspiracy and, as a direct and proximate result of Defendants unlawful conduct, as alleged herein, Plaintiffs are being irreparably harmed and are entitled to have Defendants' conduct enjoined and restrained.

**SECOND AMENDED COMPLAINT**

# **FOURTH CLAIM FOR RELIEF**

## **VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**

### **Against All Defendants**

123.   Plaintiffs incorporate averments set forth in paragraphs 1-122 above, as if set forth in full herein.

124.   Section 17200 of the California Business & Professions Code ("Unfair Competition Law" or "UCL") prohibits any "unlawful," "unfair" and "fraudulent" business practice.

125.   Defendants' acts and practices, as averred herein, constitute unlawful, unfair and fraudulent business practices, in violation of the UCL.

126.   California Business and Professions Code section 17204 allows a person, which includes a corporation, injured by unfair business acts or practices to prosecute a civil action for violation of the UCL.

127.   Defendants' acts and practices, as averred herein, constitute unlawful practices in that they are tortious, and, in particular, intentionally interfere with contractual relations between Plaintiffs and their vacation owners and members, and violate 18 U.S.C. § 1962(c) (Civil RICO) and 15 U.S.C. § 1125 (Lanham Act); and Business and Professions Code sections 6150, *et seq.* (California's Runners and Cappers Act), 6155 (California's Lawyer Referral law), 11245, *et seq.* (California's Vacation Ownership and Time-Share Act), and 17500, *et seq.* (California's False Advertising Act).

128.   Defendants have violated Business and Professions Code sections 6151 and 6152 by engaging in "Running and Capping," the practice of non-attorney agents obtaining business for an attorney or law firm for compensation, or soliciting other to engage in running in capping.  Defendants have also violated Business and Professions Code sections 6155 and Article 1, Rule 3.700 of Title 3, Division 5, of the Rules of the State Bar of California, by operating for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys, and accepting such referrals, without complying with the registration and other requirements of Business & Professions Code section

**SECOND AMENDED COMPLAINT**

6155.

129.   On information and belief, Defendant TET actively solicits Welk's owners and members through the unfair and misleading practices described above. TET then contracts with Welk owners for a flat fee, determined by the amount the owners still owe to Welk. TET has preexisting agreements with outside attorneys (SGB and Privett) to write letters on the owners' behalf, for a portion of the original flat fee, but explicitly precludes these firms from representing the owners directly. Although the outside attorneys write to Welk with the claim that they represent the owners, on information and belief, the attorneys do not represent their "clients, do not know the particulars of their "clients'" cases, and instead attempt to negotiate a quick exit, without having to invest time or money researching their position.

130.   Any contract for professional services secured by any attorney at law or law firm in California through the services of a runner or capper is void. Plaintiffs have been substantially harmed by Defendants' violations of Running and Capping laws, and are entitled to relief, including injunctive relief, restitution for costs incurred associated with Defendants' actions, and disgorgement of all profits accruing to Defendants because of their actions.

131.   Additionally, any contract for professional services secured by any attorney at law or law firm in California through the services in violation of Business and Professions Code section 6155 is void. Plaintiffs have been substantially harmed by Defendants' violations, and are entitled to relief, including injunctive relief enjoining Defendants from soliciting Plaintiffs' vacation owners and members in violation of California Referral Service laws, restitution for costs incurred associated with Defendants' actions, and disgorgement of all profits accruing to Defendants because of their actions.

132.   Defendants' business practices, as detailed herein, are also unfair, as they are unethical, oppressive, and unscrupulous, and they violate fundamental policies of this State. Further, any justification for Defendants' wrongful conduct is outweighed by the

**SECOND AMENDED COMPLAINT**

adverse effects of such conduct. Plaintiffs and vacation owners could not reasonably avoid the harm caused by Defendants' wrongful practices. Furthermore, Defendants' acts and practices constitute unfair business practices in that they misled consumers by making misrepresentations and untrue statements about their relationship and contractual obligations with Welk, their ability to guarantee an exit from their vacation ownership, and that Welk's vacation owners and members would incur no consequences if they stopped paying on their contractual obligations.

133. Assuming, arguendo, that Defendants' practices are not express violations of the laws, those practices fall within the penumbra of such laws and a finding of unfairness can properly be tethered to public policy. Thus, Defendants engaged in unfair business practices prohibited by Business & Professions Code sections 17200, *et seq*.

134. Defendants' business practices, as detailed herein, are also fraudulent, as they misled consumers by making misrepresentations and untrue statements about their relationship and contractual obligations with Welk, their ability to guarantee an exit from their vacation ownership, and that Welk's vacation owners and members would incur no consequences if they stopped paying on their contractual obligations. On information and belief, reasonable members of the public are likely to be deceived by Defendants' misrepresentations and untrue statements.

135. As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices averred herein, Plaintiffs have suffered injury in fact. To be sure, Welk has suffered significant damage, including $5.68 million worth of loan balances that it would have otherwise received through Welk's contractual relationship with its owners, $256,000.00 worth of yearly VOA Dues owed to the Association by Welk owners, pursuant to the Purchase Agreements, and $9.8 million worth of future losses in VOA Dues contractually owed to Welk.

136. Plaintiffs have been injured in that they have had to expend money, time, and energy in the form of hiring additional staff to manage the substantial volume of "exit" letters coming from TET's co-conspirator law firms, including Privett and SGB.

Welk has also had to expend money, time, and energy maintaining its established contractual relationships with Welk owners.

137.  Welk has also suffered injury as a result of Defendants' actions for which there is no adequate remedy at law. Welk is informed and believes and thereon avers that unless restrained by order of this Court, Defendants will continue the acts averred above, or similar acts.

138.  Because of Defendants' unfair, unlawful and fraudulent business practices, Welk is entitled to relief, including restitution for costs incurred associated with Defendants' solicitations and disgorgement of all profits accruing to Defendants because of their unlawful and unfair business practices, injunctive relief, and attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5.

## FIFTH CLAIM FOR RELIEF

### VIOLATION OF THE CALIFORNIA VACATION OWNERSHIP AND TIME-SHARE ACT

#### Against Defendant Reed Hein & Associates, LLC

139.  Plaintiffs incorporate averments set forth in paragraphs 1-138 above, as if set forth in full herein.

140.  In California, the offering of time-share plans is regulated under the Vacation Ownership and Time-Share Act of 2004 ("Time-Share Act"). *See* Cal. Bus. & Prof. Code §§ 11210, *et seq.* The Time-Share Act has broad application to all time-share plans with an accommodation or component site in California, and to such plans without an accommodation or component site in California, if the plans are sold or offered to be sold to any individual located within California. Cal. Bus. & Prof. Code §11211.

141.  TET is an entity subject to the Time-Share Act as TET attempts to either void Welk owners' contracts and/or transfer the ownership to a third party, all in exchange for Welk owners' money.

142.  TET's acts and practices, as averred herein, constitute false and misleading advertisements in connection with timeshares, in violation of the Time-Share Act,

California Business and Professions Code section 11245, *et seq*.

143. California Business and Professions Code sections 11245 and 11285 allows a person, which includes a corporation, to prosecute an action for an injunction, damages, and/or declaratory relief, in connection with a timeshare, for any material misrepresentation that is false or misleading in connection with the timeshare, or for any material misrepresentation of an incidental benefit.

144. TET has been sending and providing knowingly false and misleading information to Welk owners, advising them, among other things, that they are "guaranteed" to permanently eliminate all of their vacation ownership obligations, that they have preexisting relationships with Welk, and that they would incur no damage to their credit reports if they stop payments.

145. Moreover, as another example of TET's wrongful practices, on or about July 3, 2017, a Welk employee attended the San Diego County Fair at the Del Mar Fairgrounds. The employee stopped at a Timeshare Exit Team booth present at the fairgrounds' exhibitor area. *See* **Exhibit D.** The representative (Angie Poole) made several false promises to the individual in order to secure business in an attempt to interfere with Welk's operations, including:

   a. That the cost of service from TET would be approximately "$2,000 to $5,000" up front;

   b. That the individual could "stop paying on the timeshare" in order to afford TET's services;

   c. That TET works with experienced attorneys who "guarantee" they will get people out of their contracts;

   d. That TET "does business with Welk";

   e. That TET instructs owners to "stop paying" on their ownerships and that this activity "won't negatively affect" their credit; and

   f. That exit from an ownership is "guaranteed" and all credit repair is also "guaranteed" if credit has been negatively affected.

-36-

146.  Each of these representations made by TET, and its associates, was false and misleading, and in violation of California Business and Professions Code section 11245.

147.  As a direct and proximate result of TET's knowingly false and misleading correspondence, as averred herein, Welk has suffered significant damage, including $5.68 million worth of loan balances that it would have otherwise received through Welk's contractual relationship with its owners, $256,000.00 worth of yearly VOA Dues owed to the Association by Welk owners, pursuant to the Purchase Agreements, and $9.8 million worth of future losses in VOA Dues contractually owed to Welk.

148.  Additionally, Welk has also had to expend money, time, and energy in the form of hiring additional staff to manage the substantial volume of "exit" letters coming from TET's co-conspirator law firms, including Privett and SGB.  Welk has also had to expend money, time, and energy maintaining its established contractual relationships with Welk owners.  Furthermore, Welk has suffered reputational damage as a result of TET's violation of the Time-Share Act.

149.  These damages are all a direct result of TET's conduct, which was done to mislead a reasonable vacation owner, including Welk owners.

150.  Welk has also suffered injury as a result of TET's actions for which there is no adequate remedy at law. Welk is informed and believes and thereon avers that unless restrained by order of this Court, TET will continue the acts averred above, or similar acts.

151.  Because of TET's knowingly false and misleading scheme, Welk is entitled to relief, including monetary damages, injunctive relief, and attorneys' fees and costs.

## SIXTH CLAIM FOR RELIEF

### VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW

### Against Defendant Reed Hein & Associates, LLC

152.  Plaintiffs incorporate averments set forth in paragraphs 1-151 above, as if set forth in full herein.

153.  Pursuant to California Business and Professions Code 17500, *et. seq.*, it is

unlawful to engage in advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

154.   Moreover, as another example of TET's fraudulent and illegal advertising, on or about July 3, 2017, a Welk employee attended the San Diego County Fair at the Del Mar Fairgrounds. The employee stopped at a TET booth present at the fairgrounds' exhibitor area. *See* **Exhibit D.**   The representative (Angie Poole) made several false promises to the individual in order to secure business in an attempt to interfere with Welk's operations, including:

     a.  That the cost of service from TET would be approximately "$2,000 to $5,000" up front;

     b.  That the individual could "stop paying on the timeshare" in order to afford TET's services;

     c.  That TET works with experienced attorneys who "guarantee" they will get people out of their contracts;

     d.  That TET "does business with Welk";

     e.  That TET instructs owners to "stop paying" on their ownerships and that this activity "won't negatively affect" their credit; and

     f.  That exit from an ownership is "guaranteed" and all credit repair is also "guaranteed" if credit has been negatively affected.

155.   TET misled consumers by making misrepresentations and untrue statements about their relationship and contractual obligations with Plaintiffs, their ability to guarantee an exit from their vacation ownership, and that Plaintiffs' vacation owners and members would incur no consequences if they stopped paying on their contractual obligations.

156.   As a direct and proximate result of TET's false advertising practices averred herein, Plaintiffs have suffered injury in fact.

157.   Welk has suffered significant damage, including $5.68 million worth of loan balances that it would have otherwise received through Welk's contractual relationship

with its owners, $256,000.00 worth of yearly VOA Dues owed to the Association by Welk owners, pursuant to the Purchase Agreements, and $9.8 million worth of future losses in VOA Dues contractually owed to Welk.

158.   Additionally, Welk has also had to expend money, time, and energy in the form of hiring additional staff to manage the substantial volume of "exit" letters coming from TET's co-conspirator law firms, including Privett and SGB.  Welk has also had to expend money, time, and energy maintaining its established contractual relationships with Welk owners.  Furthermore, Plaintiffs have suffered reputational damage as a result of TET's conduct.   TET's conduct is such that it would also mislead a reasonable vacation owner. Moreover, TET is profiting from its wrongful conduct in the form of fees charged..

159.   The misleading and false advertising described herein presents a continuing threat to Plaintiffs in that TET persists and continues to engage in these practices, and will not cease doing so unless and until forced to do so by a binding decision-maker. Plaintiffs are entitled to preliminary and permanent injunctive relief ordering TET to cease its false advertising.

160.   Because of TET's false advertising practices, Plaintiffs are entitled to relief, including restitution for costs incurred associated with TET's solicitations and disgorgement of all profits accruing to TET because of its unlawful and unfair business practices, injunctive relief, and attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5.

<strong><u>SEVENTH CLAIM FOR RELIEF</u></strong>

<strong>FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT,</strong>

<strong>15 U.S.C. § 1125(a)</strong>

<strong>Against Defendant Reed Hein & Associates, LLC</strong>

161.   Plaintiffs incorporate averments set forth in paragraphs 1-160 above, as if set forth in full herein.

162.   This is a cause of action for false advertising under the Lanham Act, 15

-39-

U.S.C. § 1125(a), and is within this Court's jurisdiction.

163. TET's advertised "timeshare exit" services travel in interstate commerce.

164. TET misleadingly advertises on the Internet and radio, on its website and through celebrity endorsements, that it guarantees it will relieve vacation owners of their obligations if TET is retained.

165. TET is in direct competition with Plaintiffs for the payments Welk owners owe to Plaintiffs. TET specifically seeks out Welk owners to make payments to TET instead of Plaintiffs.

166. TET's statements that it guarantees it will relieve vacation owners of their obligations if TET is retained are false or misleading or made in bad faith.

167. TET deceived, or had the capacity to deceive, consumers, thereby having a material effect on consumer purchasing decisions and resulting in damages to Plaintiffs.

168. As a direct and proximate result of TET's false advertising practices averred herein, Plaintiffs have suffered injury in fact.

169. Welk has suffered significant damage, including $5.68 million worth of loan balances that it would have otherwise received through Welk's contractual relationship with its owners, $256,000.00 worth of yearly VOA Dues owed to the Association by Welk owners, pursuant to the Purchase Agreements, and $9.8 million worth of future losses in VOA Dues contractually owed to Welk.

170. Additionally, Welk has also had to expend money, time, and energy in the form of hiring additional staff to manage the substantial volume of "exit" letters coming from TET's co-conspirator law firms, including Privett and SGB. Welk has also had to expend money, time, and energy maintaining its established contractual relationships with Welk owners. Furthermore, Plaintiffs have suffered reputational damage as a result of TET's conduct. TET's conduct is such that it would also mislead a reasonable vacation owner. Moreover, TET is profiting from its wrongful conduct in the form of fees charged..

171. Additionally, an injunction is warranted here, and is a viable form of relief

for violation of the Lanham Act. TET's misleading and false advertising described herein presents a continuing threat to Plaintiffs as TET persists and continues to engage in these practices, and will not cease doing so unless and until forced to do so by a binding decision-maker. Plaintiffs are entitled to preliminary and permanent injunctive relief ordering TET to cease its false advertising.

## PRAYER

Wherefore, Plaintiffs pray for judgment as follows:

### AS TO THE FIRST CLAIM FOR RELIEF

1. For general and special damages proximately caused by Defendants' tortious conduct, as averred herein.

2. For punitive damages.

3. For attorneys' fees.

### AS TO THE SECOND CLAIM FOR RELIEF

1. For injunctive relief enjoining Defendants from soliciting Welk owners, from false and misleading advertising, and from encouraging and/or offering to assist them in breaching their vacation ownership obligations.

2. For compensatory damages, in an amount to be proven at trial, which are in excess of the jurisdictional minimum of this Court, including interest as permitted by law;

3. For treble damages under the 18 U.S.C. 1964(c);

4. For attorneys' fees.

### AS TO THE THIRD CLAIM FOR RELIEF

1. For injunctive relief enjoining Defendants from soliciting Welk owners, from false and misleading advertising, and from encouraging and/or offering to assist them in breaching their vacation ownership obligations.

2. For compensatory damages, in an amount to be proven at trial, which are in excess of the jurisdictional minimum of this Court, including interest as permitted by law;

### AS TO THE FOURTH CLAIM FOR RELIEF

1. For injunctive relief enjoining Defendants from soliciting Welk owners,

**SECOND AMENDED COMPLAINT**

from false and misleading advertising, and from encouraging and/or offering to assist them in breaching their vacation ownership obligations.

2. For restitution.

3. For disgorgement of profits.

4. For attorneys' fees pursuant to California Code of Civil Procedure section 1021.5.

## AS TO THE FIFTH CLAIM FOR RELIEF

1. For injunctive relief enjoining Defendants from soliciting Plaintiffs' vacation owners and members, from false and misleading advertising, and from encouraging and/or offering to assist them in breaching their vacation ownership obligations.

2. For general and special damages proximately caused by Defendants' conduct, as averred herein.

3. For attorneys' fees.

## AS TO THE SIXTH CLAIM FOR RELIEF

1. For injunctive relief enjoining Defendants from soliciting Plaintiffs' vacation owners and members, from false and misleading advertising, and from encouraging and/or offering to assist them in breaching their vacation ownership obligations.

2. For restitution.

3. For disgorgement of profits.

4. For attorneys' fees pursuant to California Code of Civil Procedure section 1021.5.

## AS TO THE SEVENTH CLAIM FOR RELIEF

1. For injunctive relief enjoining Defendants from soliciting Plaintiffs' vacation owners and members, from false and misleading advertising, and from encouraging and/or offering to assist them in breaching their vacation ownership obligations.

1     2.     For restitution.

2     3.     For attorneys' fees.

## AS TO ALL CLAIMS FOR RELIEF

1.     For costs of suit herein.

2.     For such other and further relief as this Court may deem just and proper.

Date:  October 6, 2017         **GODES & PREIS, LLP**

By:  */s/ Michael L. Kibbe*
       James N. Godes
       Michael L. Kibbe
       Attorneys for Plaintiffs
       WELK RESORT GROUP,
       INC. and WELK RESORTS
       PLATINUM OWNERS
       ASSOCIATION

# EXHIBIT A



## We are NOT a listing company.

Our Consumer Protection Firm is ready to help you dissolve your timeshare contract.

**Safely. Legally. Forever.**

What makes us different:

- Free Consultation
- Local Offices
- Nationally Endorsed and BBB Accredited
- 100% Money Back Guarantee

## Testimonials

They did exactly what they said they'd do... and the people were so kind and willing to answer any questions.

— Marcia D

The team was professional, honest, and I am now timeshare free. I am very pleased with the experience.

— Sue C

**Tiffany V.** Client Advisor Lynnwood, WA

## timeshareexitteam.com

**1-855-733-3434**

BY reedhein
A CONSUMER PROTECTION FIRM





Nationally Endorsed by
THE DAVE RAMSEY SHOW

EXHIBIT A
2

# DITCH YOUR TIMESHARE

## we can help you
### EXIT YOUR TIMESHARE

### 100% GUARANTEED

Schedule your free consultation today.

*Angie Poole*

*Dave*

*Alex*
*Brian*





Nationally Endorsed by

## timeshareexitteam.com
BY reedhein
A CONSUMER PROTECTION FIRM

# 1-855-733-3434

EXHIBIT A
3

# EXHIBIT B

# KEN B. PRIVETT, PLC ATTORNEY AT LAW

P.O. Box 97, 524 5th Street
Pawnee, Oklahoma 74058

Office: (918) 762-2705 or (877) 377-8699
Fax: (918) 513-7779
E-mail: documents@kenprivettplc.com

A member of the bar in the states of Oklahoma & Colorado

January 12, 2017

Welk Resorts
8860 Lawrence Welk Dr.
Escondido, CA 92026

**RE:** ███████████        **ACCOUNT #:** ███████████

**RESORT: VILLAS AT THE WELK**

Dear Sir/Madame:

Please be advised that we want to terminate the above referenced owners' obligation with your timeshare company, including the mortgage and promissory note, if applicable. We would entertain a small transfer fee.

Please grant us this request.

Thank you.

Sincerely yours,

Ken B. Privett
Manager, PLC

KBP/cr



**SGB**

**SCHROETER
GOLDMARK
BENDER**

ESTABLISHED 1969

March 1, 2017

Attn: Member Services
Welk Resorts
300 Rancheros Drive, Suite 450
San Marcos, CA 92069

Dear Sir/Madam:

We are writing to advise you that this law firm represents the below referenced owners with regard to their timeshare memberships with your organization.

Our Clients/Your Purchasers:                Contract/Member Nos.:



Our clients are interested in terminating their time share memberships. With the lone exception of forwarding routine billings to the clients via mail, you are hereby notified not to contact our clients in any format. Please direct all further correspondence and communications regarding the proposed termination and anything related to it, to our office.

Also, please confirm within 30 days that this letter has arrived at the correct department, and let us know where to send future correspondence. You may also confirm receipt by emailing us at leiferman@sgb-law.com.

If you have any questions or would like to discuss these matters further, please do not hesitate to contact our office. Together with local counsel, we look forward to working with you to resolve these matters. We thank you in advance for your good consideration.

Sincerely,

JAMES HAILEY
Attorney at Law

THOMAS BREEN
Attorney at Law

# EXHIBIT C

EXHIBIT C
7

# MASTER FEE AGREEMENT

1. <u>Parties</u>: Reed-Hein and Associates ("RHA" hereinafter) located at 3400 188th St. SW, Suite 300, Lynnwood, WA 98037, wishes to utilize the services of Ken B. Privett, PLC, an Oklahoma Professional LLC, ("KBP" hereinafter), whose postal address and physical address is located at P.O. Box 97, 524 Fifth St. Pawnee, OK 75058, to provide timeshare cancellation services to RHA. The Parties agree that it will be impractical to enter into a separate agreement for services each time RHA desires to engage KBP. In order to expedite the use of KBP services each time it is needed, the parties agree to enter into and comply with this Master Fee Agreement prior to any actual services being performed. It is the intent of the parties that these terms and conditions apply to any provision of services by KBP regardless of whether these terms and conditions are referenced in any e-mail, or subsequent memo/correspondence during the term of this agreement. This agreement will take effect, and KBP will provide services upon RHA's return of a signed copy of the agreement and payment for each new file. KBP is in association with John Mortimer, Attorney at Law, of Temecula, CA.

2. <u>Scope of KBP Services</u>: RHA agrees to pay KBP to provide the following services for RHA:

   A. Review case files as provided for herein in order to determine what legal remedies are available. No Court filings are to be undertaken or contemplated by the parties, unless mutually agreed by the parties.

   B. KBP will contact the timeshare resort in writing and by phone and email on behalf of RHA in the name of the timeshare owners, who are RHA's customers. The language used shall be at the discretion KBP.

   C. As agreed, direct RHA to obtain information and/or documentation from RHA's customers to determine what legal remedies are available.

   D. Negotiate settlement and cancellation of timeshare deeds and contracts, and surrender of ownership on behalf of RHA for its customers

   The maximum term of agreement between the parties shall be for 18 months.

   KBP retains in its discretion, exclusive control over the manner as to how it performs its services. RHA is not paying for KBP to represent RHA or its customers in court or in a trial. The services provided by KBP consist of letters, phone calls, and emails. It is understood that KBP does not work for RHA as an employee or partner and does not share fees with RHA or represent RHA's customers directly. RHA agrees that KBP may hire paralegals, independent contractors and employees to work on RHA customer files. KBP may not contact RHA's customers, unless mutually agreed by the parties. KBP represents RHA only and not its customers. KBP does not guarantee a result for the customers of RHA therein.

EXHIBIT C

8

3. Duties of RHA: RHA agrees to provide KBP with RHA's current address and phone number on an ongoing basis and to timely respond to any requests from KBP for documents or information. RHA will never guarantee any particular result or outcome to RHA's clients. RHA will never represent that KBP recommends or request RHA's customers stop paying their timeshare obligations. RHA shall request from its customers in their agreement that the customer shall pay the transfer fee if requested by the time share companies- the seller of timeshares. RHA will not represent to its customers that KBP is the customer's attorney. KBP and RHA shall mutually approve all scripts of RHA before work commences.

4. Additional Duties of RHA: For each file provided to KBP by RHA, RHA will provide the following documents, if available, except for J below, which is mandatory, to-wit:

   A. Purchase Agreement/contract
   B. Loan Documents or mortgage if any
   C. Good Faith Estimate
   D. HUD 1 closing Document
   E. Signed Disclosure from RHA and signed by RHA customer.
   F. Deed and any other recorded documents
   G. Any correspondence or emails from RHA or its customers to the timeshare resort
   H. Any other documents, or contracts relating to the timeshare.
   I. Current maintenance bill and/or mortgage statement
   J. A power of attorney from customer to RHA giving RHA the power to pursue a time share cancellation, including a surrender of ownership, and the delegation of said power to KBP from RHA, couched as a third party delegation by RHA, in the power of attorney.

5. Chargeback's: If a timeshare relief contract does not close and terminate the timeshare for a customer, then the fees paid to KBP for that customer shall be credited back to RHA, after 18 months. The fees shall be applied to other files sent to KBP by RHA, at the option of RHA.

6. Demise of KBP: If KBP should become disabled or pass on, all paid up accounts shall continue in full force and effect. The current and ongoing work shall not cease. John Mortimer shall take over the duties, liabilities and responsibilities of KBP in this case.

7. Fee Payment by RHA to KBP: For each customer file for a single timeshare, RHA agrees to pay KBP the sum of $1,200.00. The fee is deemed earned on receipt by KBP, and not held in trust.

8. KBP's Disclaimer of Guarantee: KBP cannot make any guarantee as to the outcome of a particular file. There is the potential for RHA's customers to incur negative credit reporting, foreclosure, or legal actions against the customer.

EXHIBIT C

9

9. <u>Exclusivity and Term of Agreement:</u> RHA agrees to exclusively use the services of KBP for two (2) years from the date that both parties have signed the agreement for timeshare cancellation services, for current business or new business obtained by RHA. The agreement will automatically renew for subsequent one year terms; unless either party cancels the agreement in writing 30 days prior to the end of the two (2) year term.

10. <u>Modification of Agreement:</u> This agreement may be modified by both parties in writing.

11. <u>Severability:</u> If any part of this agreement is found to be illegal or invalid, the balance of the agreement will remain in full force and effect.

12. <u>Indemnification:</u> Parties agree to indemnify one another for the acts, omission, fraud, negligence, or crimes committed by the respective parties' agents, employees, or assigns which may arise out of the performance of this agreement.

13. <u>Signature in Counter-Parts and Original Contract:</u> This agreement, and any other agreements between the parties, may be signed in counter-part, and the separate parts/signatures shall constitute a fully executed agreement. A true and correct of the agreement and the signatures shall be deemed to be an "original" agreement and used for any purpose that an original agreement may be used for.

14. <u>Updated Contact Information:</u> Parties agree to provide each other with current information regarding their respective addresses, email addresses, phone numbers, and contact information within five business days of any changes.

15. <u>Confidentially:</u> Parties agree that a mutual confidentiality clause is beneficial and essential and will apply to the terms of this agreement, and the relationship of the parties. No third party disclosure shall occur without the written permission of the other party.

16. <u>Jurisdiction & Venue:</u> This contract will be deemed by the parties to be entered into in Pawnee County, Oklahoma and Oklahoma state law shall apply. Any disputes between the parties subject to this agreement shall be heard in the District Court of Pawnee County, Oklahoma.

DATED: 7/7/15

BRANDON REED, PRESIDENT
REED HEIN AND ASSOCIATES

DATED: 7/7/15

KEN B. PRIVETT, MANAGER
KEN B. PRIVETT, PLC

DATED: 7/7/15

JOHN MORTIMER, CO-MANAGER
KEN B. PRIVETT, PLC

EXHIBIT C
10

# MEMORANDUM OF UNDERSTANDING
# &
# AMENDMENT OF AGREEMENT

1. Pursuant to the July 7, 2015 contract between "RHA" and "KBP" (the "Contract") the parties agree to the following prospective modification of said contract, effective March 17, 2016 as follows:

2. Clients. Timeshare owner will appoint RHA attorney-in-fact to retain a lawyer on his or her behalf. KBP will serve as the attorney for the timeshare owner (timeshare owner is KBP's client) upon payment of the fee by RHA (on behalf of timeshare owners) as provided herein. KBP will provide RHA the Instructions & Disclosure For the Release & Authorization Form and the Release & Authorization Form, and RHA will submit these documents to the timeshare owners for signatures. Once the Disclosure Form and the Release & Authorization Form are executed by the client, and the signed copies are returned to KBP, then KBP will commence work on the respective files therein. No guarantees are made as to file outcomes by KBP, PLC, or RHA

3. Payment of Fees. On or before the 5th day after billing, RHA shall pay KBP a fee per file of $650.00 for each and all files transmitted to KBP by RHA. RHA agrees to send a minimum of 800 files per month to KBP, unless RHA takes-in less than 800 files and will in such case, inform KBP of the shortfall. The fee is deemed earned upon receipt, and not held in trust. RHA will provide KBP with a signed and notarized copy, or if necessary the original, of the KBP Disclosure and the Release and Authorization form from the client(s), when requested by KBP. The parties agree that Sections 7 and 9 of the Contract herein is hereby replaced prospectively, with this new provision, effective March 17, 2016, except the term of the agreement shall remain as stated in Paragraph 9, i.e. two (2) years from July 7, 2015 and the agreement shall renew for one (1) year periods thereafter, unless either party cancels the agreement in writing 30 days prior to the end of the two (2) year term.

4. Compliance with Laws. Both parties agree to comply in all material respects and at all times with all federal, state and local laws and regulations governing their performance of the Contract.

5. Errors and Omissions. KBP will increase the coverage of its error and omissions (malpractice) policy to an amount of at least $2 million.

6. Successful Timeshare Cancellation. An exit shall be considered a Successful Timeshare Cancellation when KBP receives a writing (including email) from the resort canceling the timeshare owner's interest in the timeshare.

EXHIBIT C
11

7. <u>Sales Force</u>. The parties will work together to implement the Sales Force Platform and to enter milestones which will allow both parties to ascertain the status of cases through the platform. The parties agree to work together to monitor case progress and ensure that cases are becoming Successful Timeshare Cancellations in a timely manner.

8. <u>Full Force</u>. Except as amended herein the Contract remains unchanged and in full force and effect.

**DATED** this 17th day of March, 2016.

KEN B. PRIVETT, PLC

By _____
Ken B. Privett, Manager

REED HEIN & ASSOCIATES LLC

By _____
Brandon Reed, President

EXHIBIT C

12

# EXHIBIT D



# EXHIBIT E

# Got timeshare regret? What to do about it

Nicholas Clements, Special for USA TODAY     7:30 a.m. EDT July 6, 2016



*(Photo: iStockphoto)*

Did you buy that dream timeshare, only to wake up with buyer's remorse? If you are regretting your purchase, you do have options.

First, the bad news. Timeshares are not investments. Their value declines rapidly over time, and the maintenance fees can and likely will increase. If you feel stuck, here are four options that could help:

- Refinance the timeshare mortgage.
- Sell or give away your timeshare.
- Try to give it back to the resort.
- Work with a company to help you negotiate an exit.

## Refinance your timeshare loan

If you like your timeshare, but you don't like the high interest rate on your loan, you can refinance. LightStream (https://www.lightstream.com/timeshare-loans), an online lender owned by SunTrust Bank, offers a timeshare refinance loan. Interest rates start at 5.99% and there is no origination fee or prepayment penalty. According to Todd Nelson of LightStream, "Financing is most commonly and conveniently offered by developers when buyers purchase their timeshare. As a result, owners may think they have no other option and, in fact, may wind up with higher rates than they may need to pay." You need good credit to qualify.

Home equity loans, personal loans and even 0% balance-transfer offers from credit card companies can often provide lower interest rates than developer loans. You can shop online for personal loans at MagnifyMoney (http://www.magnifymoney.com/compare/personal-loans/) or NerdWallet (https://www.nerdwallet.com/personal-loans) to find the best rates.

Refinancing provides one additional benefit: You will have greater flexibility to negotiate an exit or give away your timeshare because you will no longer have a mortgage attached to it.

## Sell it or give it away

Timeshares rapidly lose value, so you should not be surprised to receive only a fraction of your original purchase price. Sometimes you can't even give them away.

Be cautious of any company that promises an amazing resale price but asks for money upfront. According to the Federal Trade Commission (https://www.consumer.ftc.gov/articles/0073-timeshares-and-vacation-plans#selling), "If you want to sell your deeded timeshare, and a company approaches you offering to resell your timeshare, go into skeptic mode."



USA TODAY

With travel rewards credit cards, timing is everything

(http://www.usatoday.com/story/money/personalfinance/2016/04/14/travel-rewards-credit-cards-timing-everything/82917796/)

As a starting point, try to determine the market value of your timeshare by visiting RedWeek (http://www.redweek.com/) or the Timeshare Users Group (http://tug2.com/timeshare-marketplace.aspx). You can try to sell your timeshare online at these sites. EBay and Craigslist are also popular options. You might have to cover closing costs and some maintenance fees to get a sale.

Before putting your timeshare on the market, check to see if your resort has a sales office. Howard Nusbaum, the CEO of the American Resort Development Association, believes you have better chances if your resort has an active sales office because it "has the ability to recycle inventory quickly."

## Give it back to the resort



You might be able to exit your timeshare obligation completely. Although the resort is under no obligation to work with you, they might. According to Michael Brown, the COO of Hilton Grand Vacations, "Should owners need to exit due to life changes, we offer a resale department that can discuss with them their options, including buy-back consideration."

If your timeshare is not operated by a big brand, make sure you reach out to the right people. Brian Rogers, the owner of Timeshare Users Group, recommends contacting your homeowners association in writing. He encourages people to "be perfectly honest" to get the best result.

**Before putting your timeshare on the market, check to see if your resort has a sales office.** *(Photo: Getty Images)*



USA TODAY

6 ways to have a happy retirement

(http://www.usatoday.com/story/money/columnist/powell/2016/05/25/6-ways-have-happy-retirement/83547956/)

## Engage with a timeshare exit company

If the resort is not willing to take it back and you cannot sell it, you might want to hire an exit company. These businesses are controversial and expensive, costing $5,000 or more to help you exit your timeshare. Do the math, but offering several years maintenance fees to a potential buyer could be a cheaper option.

At worst, you will pay a timeshare exit company to do something you could easily do yourself.

But if all else fails, you might want to consider a company like Timeshare Exit Team (https://timeshareexitteam.com/). CEO Brandon Reed explains that his company uses lawyers "to get the resort to take the timeshare back." Reed claims that his lawyers will play hardball and they get results. His company offers a guarantee: If they are not successful, you get your money back.

When deciding which company to choose, Rogers warns against using any company that requires an up-front payment. He believes that "if it was that much of a guarantee, there is no reason to charge until the end."

Some people just stop paying on their timeshares. If you do walk away, don't be surprised to see a big hit to your credit score and to start getting regular calls from collection agencies. You might regret your purchase, but you did sign a legally binding contract.

*Nick Clements is the co-founder of MagnifyMoney.com (http://www.magnifymoney.com/), a financial education and price comparison website.*

Read or Share this story: http://usat.ly/29gUscZ

# EXHIBIT F



Date: 11/23/15

REED HEIN & ASSOCIATES LLC
3400 188th ST SW Suite 300
Lynnwood, WA 98037
1-855-733-3434

## TIMESHARE OWNER EXIT AGREEMENT

**Owner(s):** _____ ___[Include All Owners]; is/are referred to herein as the "OWNER", the "CLIENT", "you" or "your".

**Timeshare Exit Team:** REED HEIN & ASSOCIATES LLC, a Washington limited liability company; is referred to herein as "REED HEIN" or "we".

OWNER desires to transfer his/her "Timeshare" ownership, i.e. transfer title and/or membership along with all associated financial obligations (collectively, the "Timeshare Ownership") with the following resort, vacation or timeshare club: _____(the "Resort"). REED HEIN provides their clients with a safe and secure transfer strategy for their Timeshare Ownership, and guarantee as set forth herein. REED HEIN desires to secure your ultimate objective to end your Timeshare Ownership and all the associated financial obligations.

For and in consideration of their mutual and/or respective benefits, obligations and covenants as set forth herein, for which the bargaining for, the receipt of and the sufficiency of which are hereby acknowledged, the undersigned parties agree as follows:

### FEE AMOUNT

REED HEIN's "Fee Amount" for this Agreement is $ 6645.<sup>00</sup>
The Fee Amount is payable in full upon the signing of this Agreement, unless a financing document for delayed payment is simultaneously signed, in which case such financing document is herein incorporated by this reference. The Fee Amount, and any part thereof, becomes immediately non-refundable except as may be set forth herein regarding the Guarantee.

### FEES AND COSTS

Under this Agreement there are absolutely no extra service fees or closing costs to be owed or paid by the CLIENT to REED HEIN. However, some resorts may require a cancellation fee or similar fee to end or exit an ownership, and such fee(s) may be required in your case. These fees will be no greater than the

Page - 1             Initial(s)▮▮▮ _____ Date 11/23/15L

EXHIBIT F
19

amount of this current year's maintenance fee. If so, the CLIENT will be required to pay that fee to the Resort for a successful exit. In addition, some resorts require all past maintenance fees to be paid upon the completion of an exit. If required, these past maintenance fees will be paid by the CLIENT. Whether accepted by OWNER or not, an exit agreement obtained by REED HEIN from the Resort shall meet REED HEIN's Guarantee even though the Resort may require the payment by OWNER of an exit fee.

## CLIENT'S DUTIES

A. Please remember that you own your Timeshare until the closing of the exit is finalized, thereby relieving you of ownership; and you remain responsible for all financial obligations associated with your Timeshare until the exit is completed. The closing of an exit transaction usually takes 3 to 9 months, but in some cases longer due to Resort delays or restrictions.

B. Finally, the CLIENT must sign (and notarize, as requested: typically deeded properties) and send within Fourteen (14) days of receiving them, any of the transfer documents required by the Resort and/or REED HEIN.

## REED HEIN'S DUTIES

Every remaining duty in this Agreement is for REED HEIN to perform in order for you to successfully exit your Timeshare Ownership. If REED HEIN cannot finalize your Timeshare Ownership for any reason whatsoever, you will be entitled to a full refund of the Fee Amount. BUT BE ADVISED: REED HEIN fully plans on successfully completing your exit process, so please anticipate and expect a successful closing to secure the objective: To get you out of your Timeshare Ownership and all associated financial obligations.

## THIS IS NOT A LISTING AGREEMENT!

This is a 100% certain solution Timeshare Ownership Exit Agreement. This is not a listing agreement where a timeshare ownership listing may sit unworked for months. Our Fee Agreement is GUARANTEED for complete performance (total Timeshare Ownership exit including all associated financial obligations).

## INDEPENDENT REVIEW/ADVICE; BINDING AGREEMENT

OWNER is fully satisfied with the binding terms of this Agreement. By signing below the OWNER acknowledges that he/she has had the opportunity to obtain his/her own independent legal and/or tax advice. OWNER now wants to engage REED HEIN. All terms of this Agreement become binding upon signing, and no Fee Amounts will be refunded except as specifically set forth herein. If there is any dispute under our Agreement, the laws of the state of Washington shall apply with jurisdiction granted to the Washington Superior Courts venued in Snohomish County. REED HEIN's liability under this Agreement is strictly limited to contract damages not to exceed the Fee Amount. Prior to any litigation, the parties agree to first attempt good faith mediation.

## AVOID OWNER DEFAULT

REED HEIN wants you to receive what you paid for (and to be able to end your Timeshare Ownership without unnecessary costs). As discussed on Page 1, you have few duties owed under this Agreement,

Page - 2                    Initial(s) ▮▮▮▮    _____ Date 11/23/15 L

but they are important to accomplish in order to avoid a default and forfeiture of your deposited funds. You will only have a few documents to properly and timely sign. So please avoid an unnecessary delay and call immediately if you think there could be any problem with performance. (We can help!)

## GUARANTEE

REED HEIN guarantees that it will obtain exit agreement from the Resort regarding your Timeshare Ownership, or your Fee Amount will be refunded. This Guarantee is met even though the OWNER may not accept the terms of the Resort's exit agreement. This Guarantee is contingent upon: (a) all information that is provided to REED HEIN by the CLIENT as having been accurate and complete, and (b) full cooperation with the CLIENT to respond to any RFI ("Request For Information") by REED HEIN or the Resort. This Guarantee does not apply to any transaction where the CLIENT stops or delays the exit process or refuses to sign a procured exit offer. This Guarantee is valid only when the CLIENT fulfills the duties required of them. If the CLIENT delays the process or does not properly or timely respond to REED HEIN's requests, then the Guarantee is void. If the requested exit from Timeshare Ownership cannot be obtained, and CLIENT has fully cooperated with REED HEIN, the Fee Amount you have paid for this Agreement will be fully refunded.

## [Select and mark the *applicable* Box]:

☐ CLIENT warrants that his/her Timeshare is owned free and clear of any mortgages or other lien encumbrances.

 CLIENT acknowledges the existence of a mortgage.

## RIGHT TO CANCEL THIS AGREEMENT

You may cancel this Agreement at any time prior to midnight of the third (3rd) business day after the date of signing this Agreement. In order to be a valid cancellation, you must mail your signed cancellation notice to REED HEIN's address listed at the top of this Agreement, by certified mail, return receipt requested, postage prepaid. Please call us first for rapid resolution of any concerns. REED HEIN has never had a Better Business Bureau or Washington State Attorney General complaint, or any other form of government action in all 50 states and Canada. We plan on keeping this unblemished record with the consumer public and our valued clients. So if anything concerns you please call us: we are committed to making this a positive closing chapter to your timeshare ownership.

## NOTICES

Any notices or other communications desired or required to be given under this Agreement shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid to REED HEIN to their address listed at the top of this Agreement, and/or, to the OWNER to their address listed in the attached Membership Processing form.

Page - 3                                     Initial(s) _____ Date 1/23/15


EXHIBIT F
21

**COSTS; ATTORNEYS FEES**

If any dispute should arise between the parties, the prevailing party shall be awarded by the court its reasonable costs and expenses, including reasonable attorney's fees.

**SUCCESSORS AND ASSIGNS**

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. REED HEIN may assign this Agreement or all or any part of its rights and obligations hereunder to one or more parties without the consent of OWNER.

**AMENDMENTS**

This Agreement may not be changed, modified or terminated except by a written instrument executed by both parties hereto.

**ENTIRE AGREEMENT**

This Agreement contains all of the terms agreed upon between the parties with respect to the subject matter hereof and supersedes any and all prior written or oral understandings.

OWNER ██████████████ Date 11/23/15  OWNER_____ Date_____

REED HEIN Authorized Agent: _____ Date 11/23/15



**Client Name:**
Enter Client's Name

**timeshareexitteam** By **reedhein** & ASSOCIATES

YOUR CONSUMER PROTECTION FIRM

**Client Country:** USA

## TIMESHARE INFORMATION

| Timeshare Name | Nights/Yr (click here for notes) | Special Assessment Fees/Back Maint. Fees (INCLUDE CURRENT MF) | Maintenance Fee | MF Freq. (yrs) 1or2 | Current Mortgage Balance | MTG Payment $/Month | Term of MTG (Mo) | Date of first MTG Payment | PMTS LEFT | Tot Future MTG Payments | AVG Cost Per Night (Next 15 yrs) | Cost this YEAR (Not including Spec. Assmnt+Back MFs) | Exit Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | $832 | 1 | $12,856 | $211 | 120 | 5/1/2015 | 114 | $24,086 | | $3,367 | $6,995 |
| | | | | 1 | | | | | | | | | |
| | | | | 1 | | | | | | | | | |
| | | | | 1 | | | | | | | | | |
| | | | | 1 | | | | | | | | | |

Public : Field numbers only. Input greater to show private info

Private : (Input numbers only. Input greater to show private info)

Total Yearly Maint Fees: $832

Total Future Mtg Pmts: $24,086

Total Cost per Year: $3,367

Total MF's (Next 15yrs) + Special Assessments: $20,122

**+**

**=**

Which of these would you rather pay?

MF's (Next 15yrs)+Spec. Assmnts+Fut. MTG Pmts. $44,208

**VS**

**reedhein** Exit Fee Total $6,995

TS Cost this year + Exit Fee (Includes Spec. Assmnt & Back MFs) 2.1

Reed Hein Client Advisor: Tyler Felizzak
Office Address: 4695 MacArthur Court
11th Floor
Newport Beach, CA 92650
Direct: (858) 922-5069
Main: (425) 415-1200

EXHIBIT F
23



**timeshareexitteam**

**Things To Remember**


Initial Here

1. If you have not received a Welcome email from Reed Hein within 3-5 days please check your spam/junk folder. Many times emails from us end up in client's spam/junk folders instead of their inboxes, so when you receive your Welcome email, add the email address to your contacts so all future emails will go straight to your inbox. If you still have not received any emails from us please call the client advisor you signed up with so we can solve any email problems.


Initial Here

2. **DO NOT CALL** the Timeshare Company at all, even if you are just asking if they have heard from us or what the current status is. **Any** contact from you to any of the parties involved besides Reed Hein & Associates will cause the entire process to slow down and in most cases prolong your exit. Please remember that you have retained us to handle this exit for you.


Initial Here

3. We do not communicate or release you from debts that are held by third party lenders.


Initial Here

4. **DO NOT TALK** to anyone from your Timeshare Company or Collection agency unless told to do so by Reed Hein & Associates. They will make a last ditch effort to bombard you with calls during the time period before they must comply with any cease and desist orders. If you answer, simply hang up. After 30 Days, always get their name and contact info including fax number and correspondence address and forward that to us so we can send notification again or directly to that individual or department.


Initial Here

5. Please remember that the last thing most of the timeshare companies want is to release documentation that <u>admits</u> their agreement to let you out of your contract. Like we said before, we will get you a copy of such an agreement if we can, but regardless if we are able to, we will give you an official notification from us that you have been released. In cases where the timeshare was deeded, you can make a copy of the quit claim once it has been notarized before sending it back to us which releases your name off of the timeshare permanently.


Initial Here

6. **STAY POSITIVE**, we **will** get you out of your timeshare(s) and all future associated financial obligations. Our Client Managers work with an attorney to exit your timeshare. This process can seem very slow at times as the timeshare companies will drag out the process as much as possible. Please do not despair, we WILL get you out. It's not a question of IF, only a question of WHEN. **WE GUARANTEE IT!**


Initial Here

7. **PLEASE TELL** as many people as you can that The **_Timeshare Exit Team_** has gotten you out of your timeshare when you have been exited. Just remember that because of the confidentiality agreement, you **CANNOT SAY** the name of the Timeshare Company or Resort. Remember, if you send us a referral and they sign up to get out of their timeshare, **WE WILL SEND YOU $150!!!**


Initial Here

8. Updates regarding your exit process will be emailed or mailed out monthly.


Initial Here

9. **_Reminder,_** your Client Manager is the liaison between you and our attorney. If you have any questions or concerns that you would like addressed, please contact your <u>Client Manager</u>.



**reedhein**
**& ASSOCIATES**
3400 188th Street Southwest, Suite 300
Lynnwood, WA 98037

# AGREEMENT FORM

**[X]** USA Headquarters   Suite ☐
3400 188th St SW
300
Lynnwood WA 98037
1-855-733-3434
U.S. Fax: 1-425-398-1995

Canada Headquarters
2630 Croydon Dr
Suite 200
Surrey, BC   V3Z 6T3
1-855-733-3434

## reedhein
— & ASSOCIATES —

| Location | Date |
|---|---|
| **Newport Beach, CA** | **11/23/15** |

| Appt. Type | Client Advisor |
|---|---|
| **In Person** | Tyler Feliczak |

## Owner/Client Information

| Name | Phone 1 (PRIMARY): |
|---|---|
| ▓▓▓▓▓▓ | ▓▓▓▓▓▓ |

| Billing Address: | Phone 2 (SECONDARY): |
|---|---|
| ▓▓▓▓▓▓ | ▓▓▓▓▓▓ |

| City | St./Prov. | Country | Zip/Postal Code | Email |
|---|---|---|---|---|
| ▓▓▓ | CA | USA | ▓▓▓ | ▓▓▓ |

## Payment Information

| | | |
|---|---|---|
| Timeshare Exit Fee | $6,995.00 | ☐ ACH  (USE ACH FORM)  Amt. _____ |
| Discounts | $350.00 | ☒ CHECK/CHEQUE  Amt. $6,645.00 |
| | | ☐ Credit Card(s)  Total Other CC's: _____ |
| | | Enter Name on Card  Amt. _____ |
| Total Price | $6,645.00 | 1 [_____] |
| | | Select One   Acct#   Exp   CCV |
| Downpayment | $6,645.00 | Signature |
| | | Enter Name on Card  Amt. _____ |
| Balance Due | $0.00 | 2 [_____] |
| | | Select One   Acct#   Exp   CCV |
| | | Signature |

## Exit Information

Special Arrangements/Additional CC's:

| Number of Timeshares | Exits with Balance Owing | **1** |
|---|---|---|
| **1** | Exits NO Balance Owing | **0** |

Client Advisor _____ Tyler Feliczak

Client ▓▓▓▓▓▓

Date  11/23/15

Client _____          Date _____

Version  15.10.29

# TIMESHARE DESCRIPTION SHEET



[X] **USA Headquarters**
3400 188th St SW, Suite 300
Lynnwood WA 98037
1-855-733-3434
U.S. Fax: 1-425-398-1995

[ ] **Canada Headquarters**
2630 Croydon Dr
Suite 200
Surrey, BC  V3Z 6T3

**Owner Name(s)** ▮▮▮▮▮▮▮▮

**Resort Club Name:** ▮▮▮▮▮▮▮  **City/State/Country:** _____ / ____ / _____

[ ] Deeded Property or  [X] Membership Points  [ ] Lease Term Ending _____

Owner #: ▮▮▮▮▮▮  Annual Points: 4000  Banked Points: _____

Login _____  Password _____  Anniversary Month _____

Website _____

| | | | | |
|---|---|---|---|---|
| [ ] Studio | [ ] 1 BD | [ ] 2 BD | [ ] 3 BD | **Timeshare Use Location** |
| [X] Annual | [ ] Even | [ ] Odd | [ ] Triennial | State/Prov.  **CA**   Out of Country [ ] |
| [X] Floating Week | [ ] Fixed Week | | | |
| [ ] RCI or II Acct. # _____ | | [ ] Upgraded in ____ | (Year) | |

Maintenance Fees paid through?(mm/dd/yy)  **12/31/15**  Initial: ▮▮▮▮

How much are your Maint. Fees?  **$832.12**  How Often?  **Annually**  Initial: ▮▮▮▮
Describe if Other

Maintenance Fees past due amount?:  [X] N/A  Initial: ▮▮▮▮

Does this include taxes?  [X] Yes  [ ] No  If not, how much? _____

Are payments automatically withdrawn?  [ ] Yes  [X] No (Also NO if in process of turning off AutoPAY)

Special Assessment Due?  [ ] Yes  [X] No  If yes, amount due? _____  Initial: ▮▮▮▮

Approximate Mortgage Lien owed  **$12,855.63**  Monthly Payment  **$211.28**  [ ] N/A  Initial: ▮▮▮▮

Are your Mortgage Payments (or other lien payments) Current?  [X] Yes  [ ] No  [ ] N/A  Initial: ▮▮▮▮

How much are Mortgage Payments behind?  _____  [X] N/A  Initial: ▮▮▮▮

**Checklist**
- [ ] Attach Original Contract Documents
- [ ] Attach a Recent Maintenance Fee Statement
- [ ] Personal Picture Identification (Driver's License or Gov't Photo ID)
- [ ] Exit Agreement
- [ ] Agreement Form
- [ ] Authorization Form
- [ ] Deed

Owner's Phone Number: ▮▮▮▮▮▮  Owner's Cell Phone Number: _____

E-mail: ▮▮▮▮▮▮  Mailing Address: ▮▮▮▮▮▮▮▮

Owner's Phone Number: _____  Owner's Cell Phone Number: _____

E-mail: _____  Mailing Address: _____ / ____ / ____

By signing below, you acknowledge this Form has been carefully reviewed and you have supplied true and accurate information.

Client(s) Signature: ▮▮▮▮▮▮  Signature: _____  Date: 7/13/15

EXHIBIT F
26

**DISCOUNT CALCULATOR**


**reedhein**
─── & ASSOCIATES ───

### Enter Client's Name

Exit Total Before
Discounts →

# $6,995

## DISCOUNTS

**2.5% Cred. Card Discount**

# $6,820

You SAVE:
## $175

*or*

**5% Check/Cheque Discount**

# $6,645

You SAVE:
## $350

Mark ONLY (1)"X" to Select
Which PIF Option →



**Reed Hein Client Advisor:** Tyler Feliczak
**Office Address:** 4695 MacArthur Court
11th Floor
Newport Beach, CA 92660
**Main:** (425) 415-1200
**Direct:** (858) 922-5069

# EXHIBIT G

"Our personal **GUARANTEE** to you is that our team of consumer advocates will get you out of your timeshare, period."

Brandon Reed
Founder, Timeshare Exit Team



## GET A FREE CONSULTATION

or call us at 1-800-848-2911

© 2013-2017 Reed Hein & Associates, LLC
Phone: 800-848-2911
Terms and Conditions
Reed Hein is not a law firm*



ACCREDITED
BUSINESS
Click for Review

**reedhein**
& ASSOCIATES

Corporate Office
3400 188th St. SW Suite 300
Lynnwood, WA 98037

Contact Us




powered by

# EXHIBIT H

## PROMISSORY NOTE

FOR VALUE RECEIVED, the undersigned, ▓▓▓▓▓▓▓▓▓▓, hereinafter referred to as "Maker", residing at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, promises to pay to the order of Reed Hein & Associates, LLC, hereafter referred to as "Holder", located at 3400 188th Street SW, Lynnwood, WA, 98037 the sum of **One Thousand, ($1,000.00) US Dollars**.

### Payment Terms

(A)     Term – Holder will pay $1,000 to Welk Resorts on behalf of Maker. Maker shall reimburse Holder per the terms stated in the attached Finance Agreement, which is considered part of this Promissory Note and is incorporated herein by reference in its entirety.

(B)     Delivery - Payments shall be delivered to the Holder at the address shown above or any other such address as may later be agreed upon by both parties.

(C)     Prepayments - If the Maker prepays the Note in part, the Maker agrees to continue to make the regularly scheduled payments until all amounts due under the Note are paid. There will be no penalty for prepayment of some or all of the Note.

### Failure to Pay

(A)     Default - Maker will be in default for any of the following reasons: (i) Maker does not pay the full amount of each by the date stated in the Payment Terms above, (ii) if Maker defaults on any promise made in this Note or any other note, loan or agreement with the Holder, (iii) death of the Maker, (iv) if the Maker files a bankruptcy petition or anyone files a bankruptcy petition against the Maker, or (v) if the Maker becomes insolvent and/or cannot pay the Maker's debts as they come due. Maker waives any notice of default.

(B)     Acceleration – If at any time the Maker is in default as specified herein, Holder may require the Maker to immediately pay the full amount remaining due under the Note.

(C)     Payment of Note Holders Costs and Expenses - In the event of any default, the undersigned agrees to pay all reasonable attorney fees and costs of collection to the extent permitted by law.

# FINANCE AGREEMENT

Beginning on November 1, 2016, and until the balance of $1,000.00 ("Amount Financed") is paid in full, I, ███████████, authorize the following payments to Reed Hein & Associates, LLC:

## SELECT ONE:

☐ 5 equal payments of
$200 per month

November 1, 2016 –
March 1, 2017

OR

☒ 10 equal payments of
$100 per month

November 1, 2016 –
August 1, 2017

## SELECT ONE:

Payment will be made on my Credit Card or via ACH, as directed below.

☐ ACH

Name on Account _____

Bank _____

Routing Number _____

Account Number _____

☒ CREDIT CARD

Name on Credit Card ███████████████

Account Number ███████████████████████

Expiration Date ████████

CCV ████

Payments will be processed on the 1st of each month. Your signature below indicates acceptance of the above terms and conditions.

Signature ████████████████

Date ████████████

## Notice

Any notice that must be given to Maker under this Note will be given by delivering it or mailing it by certified mail addressed to Maker at the Maker's address above. If Maker provides a different address than the address listed above, Holder must give notice to Maker at the most recent address provided. Any notice that must be given to Holder under this Note will be given by delivering it or mailing it by certified mail addressed to Note Holder at the Holder's address above. If Note Holder provides a different address than the address listed above, Maker must give notice to Holder at the most recent address provided.

## Modification

No modification or waiver of any of the terms of the Agreement shall be allowed unless by written agreement executed by both parties. No waiver of any breach or default hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

## Amendment of Promissory Note

This Promissory Note may be modified or amended only by written agreement duly executed by the Holder and Maker.

Signature of Maker

Date

Signature of Holder

Date

1

## CERTIFICATE OF SERVICE

2

3

    I am employed in the County of Orange, State of California, am over the age

of 18 and not a party to the within action.  My business address is Godes & Preis

LLP, 300 Spectrum Center Drive, Suite 1420, Irvine, CA 92618.

4

5

    On the date set forth below, I served the foregoing documents described as

6

**SECOND AMENDED COMPLAINT** on all interested parties in this action as

follows:

7

**[ X ]  BY CM/ECF NOTICE OF ELECTRONIC FILING** - I caused said

8

document(s) to be served by means of this Court's electronic transmission of the

9

Notice of Electronic filing through the Court's transmission facilities, to the parties

and/or counsel who are registered CM/ECF Users set forth in the service list

10

obtained from this Court.

11

**[ ]    BY MAIL:** I am "readily familiar" with Godes & Preis, LLP's practice for

12

collecting and processing correspondence for mailing with the United States Postal

Service.  Under that practice, it would be deposited with the United States Postal

13

Service that same day in the ordinary course of business.  Such envelope(s) were

14

placed for collection and mailing with postage thereon fully prepaid at Irvine,

California, on that same day following ordinary business practices.

15

16

**LINCOLN, GUSTAFSON & CERCOS, LLP**
Teresa M. Beck, Esq.                          *Attorneys for Defendant*

17

 *tbeck@lgclawoffice.com*                  *KEN B. PRIVETT, PLC*
Paul H. James, Esq.

18

550 West "C" Street, Suite 1400
San Diego, CA  92101

19

Telephone: (619) 233-1150

20

Facsimile: (619) 233-6949

21

**WILSON, ELSER, MOSKOWITZ, EDELMAN**

22

**& DICKER LLP**
David S. Eisen                                   *Attorneys for Defendant*

23

 *david.eisen@wilsonelser.com*          *REED HEIN & ASSOCIATES, LLC*
Gregory K. Lee

24

 *gregory.lee@wilsonelser.com*
555 South Flower Street, Suite 2900

25

Los Angeles, CA  90071-2407

26

Telephone: (213) 443-5100
Facsimile: (213) 443-5101

27

28

## CERTIFICATE OF SERVICE

| 1 | **KLINEDINST P.C.** | |
|---|---|---|
| 2 | Heather L. Rosing, Esq. | *Attorneys for Defendant* |
| |   *hrosing@klinedinstlaw.com* | *SCHROETER GOLDMARK &* |
| 3 | Gregor A. Hensrude, Esq. | *BENDER, P.S.* |
| |   *ghensrude@klinedinstlaw.com* | |
| 4 | Robert M. Shaughnessy, Esq. | |
| |   rshaughnessy@klinedinstlaw.com | |
| 5 | 501 W Broadway, Ste. 600 | |
| 6 | San Diego, CA 92101 | |
| | Telephone: (619) 239-8131 | |
| 7 | Facsimile: (619) 238-8707 | |

8      I declare that I am employed in the office of a member of the bar of this
9 Court at whose direction this service was made.

10 [ x ]   (*Federal*)  I declare under penalty of perjury under the laws of the United
11 State of America that the above is true and correct.

12      Executed on October 6, 2017, at Irvine, California.

13

14                       DANIELLE FREDERICK

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**